**In the Matter of KING RESOURCES COMPANY, Debtor.**

**No. 71–B–2921.**

United States District Court,
D. Colorado.

Dec. 9, 1974.

Fairfield & Woods by Charles E. Matheson, Denver, for Continental Illinois National Bank and Trust Co. of Chicago.

Sterling & Simon, Denver, for First National Bank of Denver, the First National Bank and Trust Co. of Tulsa and the Miami National Bank.

Hindry & Meyer, P.C. by Thomas J. Kerwin and Richard W. Breithaupt, Denver, Shearman & Sterling by John E. Hoffman, Jr., and Charles A. Beach, New York City, for First National City Bank of New York.

Davis, Graham & Stubbs by Robert L. Shanstrom, Thomas S. Nichols and A. Bruce Campbell, Denver, for United Bank of Denver, N.A.

John I. Mayer, Sheldon B. Mazor and James T. Eichstaedt, Chicago, Ill., for Securities and Exchange Commission.

## MEMORANDUM OPINION

WINNER, District Judge.

The debtor corporation issued domestic subordinated debentures in an amount of $24,456,000 and foreign subordinated debentures in an amount of $15,000,000. With interest accrued to the date of the filing of the Chapter X petition [August 14, 1971] the total face amount of issued debentures plus interest is $41,124,021. Commercial banks have outstanding loans to the debtor of almost $30,000,000, and the problem today has to do with post petition interest on the bank loans. Without attempting an exact computation, it is fair to say that the parties are talking about post petition interest on the bank loans in a present amount in the neighborhood of $12,000,000, and, of course, the claimed interest is increasing daily.

No one claims this interest against the debtor, and, accordingly, the trustee's position is essentially one. of neutrality. The combatants are the indenture trustees under the domestic and foreign debenture agreements on the one side and the several commercial banks on the other. The banks claim a right to receive payment of the post petition interest from the holders of the domestic and foreign debentures. The banks seek to accomplish this result through the plan of reorganization, and they ask a ruling by me that they are entitled to require payment of this interest through a restructuring of the trustee's proposed plan of reorganization which, as phrased by the trustee, does not make provision for payment by the debenture holders to the banks of the post petition interest.

A scorecard listing the names and numbers of the players follows:

A. The banks who ask for post petition interest are, (1) Continental Illinois Bank and Trust Company of Chicago, (2) First National Bank of Denver, (3) First National Bank and Trust Company of Tulsa, and (4) Miami National Bank. These parties I shall refer to as the "Banks."

B. Opposing the allowance of the post petition interest are the indenture trustees under the subordinated debenture agreements. The United Bank of Denver, N.A. is the indenture trustee for the domestic subordinated debentures, and the First National City Bank of New York is the indenture trustee for the foreign subordinated debentures. These parties I shall refer to as the "Indenture Trustees."

C. The Securities and Exchange Commission teams with the Indenture Trustees in opposing allowance of the post petition interest.

With this lineup, I approach the problem with a comparison of the proposed reorganization plan submitted by the trustee with the modified plan submitted by the Banks, but, prefatory to that comparison, the definition of the term "Senior Indebtedness" as that term is defined

in the indenture agreements is to be noted. Both indentures define the term as follows:

"The term 'Senior Indebtedness' shall mean the principal of and premium, if any, and interest on the indebtedness or other obligations of [King Resources Company] which is for money borrowed from or guaranteed to others. . . ." [1]

The Bank's claims which are here involved fall within this definition of "Senior Indebtedness."

The trustee's proposed plan of reorganization provides in material part:

"ARTICLE I

DEFINITIONS

"*Domestic Subordinated Debentures*: The subordinated debentures issued by the Debtor under indenture dated as of November 1, 1968, in the aggregate original amount of $25,000,000 (of which the principal amount of $24,456,000 is currently outstanding), bearing interest at the rate of $5\frac{1}{2}\%$ and due November 1, 1988. These debentures are subordinated, to the extent and in the manner set forth in the indenture, to the prior payment of 'Senior Indebtedness,' as that term is defined in the indenture under which they were issued. To the extent of any such subordination and redistribution to the holders of the Senior Indebtedness, these debentures are subrogated to the rights of the holders of the Senior Indebtedness so benefited. UNITED BANK OF DENVER N.A., is Trustee under this Indenture.

"*Foreign Guaranteed Subordinated Debentures*: The $5\frac{3}{4}\%$ Guaranteed Subordinated Convertible Debentures issued on December 11, 1968, by a wholly owned Subsidiary of Debtor formed under the laws of the Netherland Antilles, named KING RESOURCES CAPITAL CORPORATION N.V. (hereinafter referred to as KR CAPITAL), which were sold to persons other than citizens or residents of the United States of America in the aggregate principal amount of $15,000,000 (all of which are currently outstanding), bearing interest at the rate of $5\frac{3}{4}\%$, and which are due December 1988. These Debentures are obligations of KR CAPITAL, and the Debtor has guaranteed payment, which guarantee is subordinate to the prior payment of 'Senior Indebtedness' of Debtor as the term is defined in the Indenture under which they were issued. These Debentures are not contractually, under their Indenture, subordinated to any of the other debts of KR CAPITAL or the Debtor. The FIRST NATIONAL CITY BANK of New York is the Indenture Trustee.

"*Senior Debt*: The principal of and premium, if any, and interest on indebtedness or other obligations of the Debtor which is for money borrowed from or guaranteed to others and renewals, extensions and refundings of any such indebtedness, other than (a) indebtedness as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such indebtedness is not superior in right to payment of the Domestic Subordinated Debentures or the Foreign Guaranteed Subordinated Debentures, (b) the Domestic Subordinated Debentures, (c) the Foreign Guaranteed Subordinated Debentures, (d) indebtedness to any Subsidiary of the Debtor, (e) the guarantees of the Debtor endorsed on the Foreign Guaranteed Subordinated Debentures, and (f) any indebtedness which by its terms or by the Plan is subordinated to any other indebtedness of the Debtor.

---

1. Although the two indentures use slightly different language in referring to King Resources Company, the actual ultimate reference is to the debtor.

"ARTICLE V

"PROVISIONS FOR PAYMENT OR SATISFACTION OF CREDITORS

"CLASS F—GENERAL UNSECURED CLAIMS:

"The rights of all claimants includable within this class shall be modified and altered as follows:

"(a) The Trustee shall pay in cash on or before the effective date of consummation of this Plan all allowed claims in the amount of $200.00 or less or which are voluntarily reduced to $200.00 or less, without interest.

"(b) *There will be allocated to the payment of Senior Debt one share of Class A stock and one share of Class B stock for each $40.00 of allowed claims. The shares of Class A stock so allocated will be distributed to the Senior Debt claimants in accordance with their claims. The shares of Class B stock so allocated will be distributed pro rata among the persons claiming under Domestic Subordinated Debentures and Foreign Guaranteed Subordinated Debentures in accordance with the allowed claims of such persons.*

"(c) Domestic Subordinated Debentures and Foreign Guaranteed Subordinated Debentures (Subordinated Debt) together shall be allocated the same aggregate number of Class A shares as the Senior Debt. *These Class A shares so allocated shall be charged pro rata against the aggregate allowed claims of the holders of Domestic Subordinated Debentures and Foreign Guaranteed Subordinated Debentures at the rate of one share of Class A stock for each $20.00 of such claims, and all Class A shares so allocated shall be distributed to the Senior Debt holders according to the allowed Senior Debt claims.*

"After deduction of $20.00 per share for Class A shares allocated as a charge against Subordinated Debt, Class B shares shall be issued pro rata to Subordinated Debt claimants at the rate of one share for each $20.00 of

allowed Subordinated Debt claims then remaining, which shares shall be in addition to those Class B shares received from the Senior Debt allocation pursuant to Paragraph (b) above.

"(d) All other claimants in this class shall receive one share of Class A stock and one share of Class B stock for each $40.00 of allowed claims."

[The italicized language represents the Trustee's concept of a spin-up of Class A stock to Senior Debt and a spin-down of Class B stock to debenture holders. Under the proposed plan, Class A stock is given preference in case of liquidation, and the subordination agreement, quoted infra is thus recognized as to principal in event of liquidation.]

The Banks adopt the trustee's definitional sections of the proposed plan, but they want to change the provisions of "Article V, Class F, General Unsecured Claims" to provide for a preferred and common stock, [instead of a Class A and Class B stock] to create several preferences, and, importantly to this opinion, to have the debenture holders transfer over to Senior Debt shares of stock in an amount sufficient to effectively pay post petition interest on Senior Debt. The Banks' proposal of preferences to them is not immediately involved in and is not discussed in this opinion. The Banks' most recent proposal is:

"Article V, Class F—GENERAL UNSECURED CLAIMS

"The rights of all claimants includable within this class shall be modified and altered as follows:

"(a) The Trustee shall pay in cash on or before the effective date of consummation of this Plan all allowed claims in the amount of $200.00 or less or which are voluntarily reduced to $200.00 or less, without interest.

"(b) There will be allocated to all other claimants in this class one share of Preferred Stock and one share of Common Stock for each $40.00 of allowed claims. Except as provided in

(c) below, distribution shall be made in accordance with the provisions of the Plan to creditors, proofs of whose claims have been filed prior to the date fixed by the Court and are allowed, or if not so fixed, whose claims have been listed by the Trustee as fixed claims, liquidated in amount and not disputed, and to creditors whose claims shall be otherwise allowed by the Court.

"Class F claims of holders of Domestic Subordinated Debentures shall be reduced by the amount of any cash and New Stock which may be distributed to them as Class E Creditor—Investors.

"(c) In satisfaction of the subordination provisions of the Domestic Subordinated Debentures and Foreign Guaranteed Subordinated Debentures (Subordinated Debt), the shares allocated for distribution to the holders of Senior Debt and Subordinated Debt pursuant to (b) above, shall be reallocated and distributed as follows:

"(i) *All shares of Common Stock allocated to Senior Debt will be exchanged for an equal number of shares of the Preferred Stock originally allocated to the payment of Subordinated Debt.*

"(ii) *Out of the shares of Preferred Stock allocated to Subordinated Debt, there will be allocated and distributed to Senior Debt one share of Preferred Stock for each $20.00 of interest accrued and unpaid on Senior Debt, determined in accordance with the instruments evidencing such debt, from August 14, 1971, to date of distribution of the shares, if and to the extent it is determined by a final judgment of the Court, or upon any final determination after appeal of such judgment, that Senior Debt is entitled to be paid such interest in this proceeding under and pursuant to the subordination provisions of the In-*

*dentures pursuant to which the Subordinated Debt was issued.*

"After such reallocation provided for in this paragraph, the shares so allocated will be distributed to the holders of Senior and Subordinated Debt in accordance with the provisions of paragraph (b) above.

"(d) Shares of Preferred and Common Stock in the reorganized company shall be retained by the Trustee in a sufficient amount to satisfy any claims which are disputed as to the date of confirmation of this Plan, and the Court specifically reserves jurisdiction to hear and decide any such dispute."

Under the Banks' proposal, the day of decision of the question presented could be postponed, but I deem it inappropriate to delay decision, because Senior Debt and the debenture holders are entitled to have at least my ruling before being asked to vote on a plan.

The Banks' plan contemplates a spin-up of stock from the debenture holders to Senior Debt to take care of post petition interest on Senior Debt, and this the Banks say they are entitled to "under and pursuant to the subordination provisions of the Indentures pursuant to which the Subordinated Debt was issued." [2] This requires excerpting of the long, boiler plate provisions of "the Indentures pursuant to which the Subordinated Debt was issued." Article Five of the Indentures entitled "Subordination of Debentures" is the important section of the agreements, and it provides:

"Section 5.01. The Company . . . and each holder of the Debentures by his acceptance thereof likewise covenants and agrees that the payment of the principal of (and premium, if any) and interest on each and all of the Debentures is hereby expressly subordinated, to the extent and in the manner hereinafter set forth, to the

2. The trustee's plan classifies the stock into Class A and Class B, and it makes provision for a spin-up, but it does not spin-up any stock for post petition interest on Senior Debt, nor is provision made for preferences, except on liquidation.

prior payment in full of all Senior Indebtedness, . . . .

"Section 5.02. The payment of the principal and interest on the Debentures is expressly subordinated to the prior payment of any and all Senior Indebtedness, . . . unless full payment of all amounts then due for principal, sinking fund, premium (if any) and interest on any and all Senior Indebtedness shall have been made . . . . In the event that notwithstanding the provisions of this Section 5.02 the Company shall make any payment to the Trustee on account of the principal of, premium (if any) or interest on the Debentures, or on account of said Sinking Fund, after the happening of such a default, or resulting in such a default, then, unless and until such default shall have been cured or waived or shall have ceased to exist, such payment shall be held by the Trustee in trust for the benefit of, and shall be paid over and delivered to, the holders of Senior Indebtedness . . . .

"Section 5.03. Upon any distribution of assets of the Company upon any dissolution, winding up, liquidation or reorganization of the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise),

"(a) The holders of all Senior Indebtedness shall first be entitled to receive payment in full of the principal thereof (and premium, if any) and interest due thereon before the holders of the Debentures are entitled to receive any payment on account of the principal of (or premium, if any) or interest on the Debentures (other than payment in shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan or reorganization or readjustment, which stock and securities are subordinated to the payment of all Senior Indebtedness and securi-

ties received in lieu thereof which may at the time be outstanding); and

"(b) Any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (other than shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, which stock and securities are subordinated to the payment of all Senior Indebtedness and securities received in lieu thereof which may at the time be outstanding), to which the holders of the Debentures or the Trustee would be entitled except for the provisions of this Article Five, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, direct to the holders of Senior Indebtedness or their representative or representatives, or to the trustee or trustees under any indenture under which any instructments evidencing any of such Senior Indebtedness may have been issued, to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution or provision therefor to the holders of such Senior Indebtedness.

"Section 5.04. In the event . . . any payment or distribution of assets of the Company of any kind . . . other than shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan or reorganization or adjustment, which stock and securities are subordinated to the payment of all Senior Indebtedness and securities received in lieu thereof which may at the time be outstanding), shall be received by the

Trustee or the holders of the Debentures before all Senior Indebtedness is paid in full, or effective provision made for its payment, such payment or distribution shall be paid over to the holders of the Senior Indebtedness . . . until all such Senior Indebtedness shall have been paid in full . . . .

"Section 5.05. Subject to the payment in full of all Senior Indebtedness, the holders of the Debentures shall be subrogated . . . to the rights of the holders of Senior Indebtedness to receive payments or distributions of assets of the Company applicable to the Senior Indebtedness until the Debentures shall be paid in full, and for the purpose of such subrogation no payment or distributions to the holders of the Senior Indebtedness by or on behalf of the Company or by or on behalf of the holders of the Debentures shall, as between the Company and the holders of the Debentures, be deemed to be payment by the Company to or on account of the Debentures, it being understood that the provisions of this Article Five are and are intended solely for the purpose of defining the relative rights of the holders of the Debentures, on the one hand, and the holders of the Senior Indebtedness, on the other hand. . . .

"Section 5.09. Each holder of the Debentures by his acceptance thereof authorizes and directs the Trustee in his behalf to take such action as may be necessary or appropriate to effectuate the subordination provided in this Article Five and appoints the Trustee his attorney in fact for such purpose.

" . . . each holder of the Debentures by his acceptance thereof agrees that in the event of any dissolution, winding up, liquidation or reorganization of the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise) tending toward liquidation of the business and assets of the Company, it or he will immediately file its or his claim for the unpaid balance of its or his Debentures in the form required in said proceedings and cause said claim to be approved and hereby, but only to the extent necessary to effect the subordination of the Debentures to Senior Indebtedness as provided in Sections 5.03 and 5.04, assigns and transfers to the holders of Senior Indebtedness all of its or his interest in and to any and all such claims as may be filed against the Company in liquidation."

A succinct statement of the Banks' position appears in the brief of Continental Illinois:

"We accept the general proposition that, as against the bankrupt or debtor, an unsecured claimant is not entitled to be paid accrued or post-petition interest out of the estate. We also recognize that if the Senior Debt is allowed to recover directly *from KRC* its claimed post-petition interest, it will do so to the detriment of trade creditors. Such is not the desire of the Continental as the holder of Senior Debt.

"It is our assertion that the Senior Debt is entitled to have honored the contractual terms of the Indenture. The total debt allocated against KRC will not be increased and the estate of KRC will not be diminished by the post-petition interest due the Senior Debt. Instead, the post-petition interest due on Senior Debt becomes a charge against and is payable out of the fund allocated by KRC to the payment of the subordinated debenture holders in accordance with the terms of their contract."

The Banks have no choice other than to concede that they cannot collect post petition interest from the debtor. Sexton v. Dreyfus (1910) 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244; City of New York v. Saper (1949) 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710; Vanston Bondholders Protective Committee v. Green (1947) 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162; Nicholas v. United States (1966) 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853; United States v. Edens (1951) 4 Cir., 189

F.2d 876, aff'd. 342 U.S. 912, 72 S.Ct. 357, 96 L.Ed. 682; United States v. General Engineering and Manufacturing Co. (1951) 8 Cir., 188 F.2d 80, aff'd. 342 U.S. 912, 72 S.Ct. 358, 96 L.Ed. 682; 6A Collier on Bankruptcy, § 9.08. The only exceptions to the rule denying allowance of post petition interest against the debtor are set forth in Re Inland Gas Corporation (1957) 6 Cir., 241 F.2d 374, 379:

> "There are, however, well recognized exceptions to the general rule. (1) If the alleged bankrupt proves solvent, post-bankruptcy interest is paid before any surplus reverts to the Debtor. [King Resources is insolvent.] (2) If securities held by a creditor as collateral produce interest or dividends during bankruptcy such amounts are applied to post-bankruptcy interest. [There are no such securities here.] (3) If the value of the security is more than sufficient to pay both principal and interest thereon, payment of post-bankruptcy interest is allowed to the date of payment of the claim secured thereby. [The claims of Senior Debt are unsecured.]"

█ And so, I come to the question of whether, because of the provisions of the Indentures, Senior Debt is entitled to have a spin-up of stock issued to the debenture holders in the reorganized company to take care of post petition interest on Senior Debt. I concede that the question is not free from doubt, and there is little law in point. Of the two cases perhaps most closely in point, one is Re Kingsboro Mortgage Corporation (1974) S.D.N.Y. 379 F.Supp. 227, and that case is on appeal to the Second Circuit.

It should be remembered that the Banks are not parties to the Indentures, and, in a sense, they argue from the position of a third party beneficiary, although the Banks say that in making their loans, they relied on their belief that the Indentures required payment of post petition interest to the Banks by the debenture holders should King Re-

sources go into reorganization. Because the Banks are not parties to the Indentures, cases cited by them in support of the proposition that *subordination agreements between parties* are recognized in bankruptcy are not too helpful. See, Bank of America Nat'l Trust & Sav. Ass'n v. Erickson (1941) 9 Cir., 117 F.2d 796; Re Aktiebolaget, Kreuger & Toll (1938) 2 Cir., 96 F.2d 768; Bird & Sons Sales Corp. v. Tobin (1935) 8 Cir., 78 F.2d 371; In re National Discount Corp. (1963) W.D.S.C., 212 F.Supp. 929, and 3A Collier on Bankruptcy § 65.06.

The Banks rely on Bruning v. United States (1964) 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772, to support their claim of a right to charge the post petition interest against the debenture holders. I think the case is inapposite. Bruning failed to pay withholding and FICA taxes, and, of course, the government's claim for those taxes was not discharged in Bruning's bankruptcy. Bruning v. United States holds only that the taxpayer owed the taxes plus interest because the debt was not dischargeable. Chief Justice Warren said:

> "Finally, petitioner urges that we consider the present case in light of the decision in New York v. Saper, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710. As to claims against the trustee in bankruptcy, the general rule for liquidation of the bankruptcy estate has long been that a creditor will be allowed interest only to the date of the petition in bankruptcy. Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244. In New York v. Saper, supra, this Court held that the general rule applies to claims against the trustee for taxes as well as for other debts. But the instant case concerns the debtor's personal liability for post-petition interest on a debt for taxes which survives bankruptcy to the extent that it is not paid out of the estate. Petitioner asserts that the traditional rule which denies post-petition interest as a claim against the bankruptcy estate also applies to discharge the debtor from personal liability for

such interest even if the underlying tax debt is not discharged by § 17. We hold that it does not so apply.

"The basic reasons for the rule denying post-petition interest as a claim against the bankruptcy estate are the avoidance of unfairness as between competing creditors and the avoidance of administrative inconvenience. These reasons are inapplicable to an action brought against the debtor personally. In the instant case, collection of post-petition interest cannot inconvenience administration of the bankruptcy estate, cannot delay payment from the estate unduly, and cannot diminish the estate in favor of high interest creditors at the expense of other creditors. In New York v. Saper, supra, the Court found the reasons for the traditional rule applicable and held that post-petition interest on a claim for taxes was not to be allowed against the bankruptcy estate. Here, we find the reasons—and thus the rule—inapplicable, and we hold that post-petition interest on an unpaid tax debt not discharged by § 17 remains, after bankruptcy, a personal liability of the debtor."

Nor do I think that the Banks' reliance on Consolidated Rock Products Co. v. DuBois (1941) 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, is well founded. It was pre-petition interest which was there involved, and the proposed plan was held to be unfair because:

"Whether a company is solvent or insolvent in either the equity or the bankruptcy sense, 'any arrangement of the parties by which the subordinated rights and interests of the stockholders are attempted to be secured at the expense of the prior rights' of creditors 'comes within judicial denunciation'. Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co., 174 U.S. 674, 684, 19 S.Ct. 827, 830, 43 L.Ed. 1130. . . .

"The instant plan runs afoul of that principle. In the first place, no provision is made for the accrued interest on the bonds. This interest is entitled to the same priority as the principal. See American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 266, 267, 34 S.Ct. 502, 504, 58 L.Ed. 949."

The case last cited, American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry. Co., 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949, is also argued by the Banks as supportive of their claim, but some of the language of that case, if not the holding, is at least arguably contrary to the Banks' position. Post petition interest was allowed on a secured claim, but the case is illustrative of the first exception to the usual rule as noted in Re Inland Gas Corporation, *supra*. The Supreme Court held:

"And it is true, as held in Tredegar Co. v. Seaboard Air Line R. Co., 183 F. [289] 290, that as a general rule, after property of an insolvent is in *custodia legis* interest thereafter accruing is not allowed on debts payable out of the fund realized by a sale of the property. But that is not because the claims had lost their interest-bearing quality during that period, but is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full. If all claims were of equal dignity and all bore the same rate of interest, from the date of the receivership to the date of final distribution, it would be immaterial whether the dividend was calculated on the basis of the principal alone or of principal and interest combined. But some of the debts might carry a high rate and some a low rate, and hence inequality would result in the payment of interest which accrued during the delay incident to collecting and distributing the funds. As this delay was the act of the law, no one should thereby gain an advantage or suffer a loss. For that and like reasons, in case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of

the debt. But that rule did not prevent the running of interest during the receivership; and if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid. Even in bankruptcy, and in the face of the argument that the debtor's liability on the debt and its incidents terminated at the date of adjudication and as a fixed liability was transferred to the fund, it has been held, in the rare instances where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication. 2 Bl.Com. 488; Cf. Johnson v. Norris, 190 F. [459] 460(5)."

Finally, the Banks urge that In re Deep Rock Oil Corporation (1940) 10 Cir., 113 F.2d 266, mandates the inclusion of post petition interest in the spin-up of stock from the debenture holders to the Banks. That case, as I read it, allowed post petition interest to certain creditors. It holds:

"A creditor holding a prior lien is entitled to interest to the date of the payment out of the proceeds derived from the property covered by such lien. Spring Coal Co. v. Keech, 4 Cir., 239 F. 48; Central Trust Co. v. Condon, 6 Cir., 67 F. 84; McFarland v. Hurley, 5 Cir., 286 F. 365; Board of Com'rs of Sweet Water County, Wyo. v. Bernardin, 10 Cir., 74 F.2d 809.

"Where in the administration of the affairs of an insolvent corporation there are claims of different rank, the holders of prior claims are entitled to interest to the time of payment, even though the payment thereof may deprive the holders of subsequent claims of any participation in the funds of the bankrupt. Spring Coal Co. v. Keech, supra; Board of Com'rs of Sweet Water County, Wyo. v. Bernardin, supra; American Iron & Steel

Co. v. Seaboard Air Lines Ry., 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949."

To fully understand the massive fraud involved in *Deep Rock* and to understand the reasoning underlying the opinion, it is necessary to study Taylor v. Standard Gas & Electric Co. (1939) 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, where an earlier opinion in *Deep Rock* by the Tenth Circuit was reversed.[3] I do not read *Deep Rock* to require the spin-up the Banks here seek. Moreover, it is to be noted that the remaining vitality of the case has been questioned, and it has been suggested that later Supreme Court decisions require a different result.

In his concurring opinion [which was the majority opinion on the post petition interest question] in Re Inland Gas Corporation (1957) 6 Cir., 241 F.2d 374, Judge Miller said as to *Deep Rock*:

"In re Deep Rock Oil Corp., 10 Cir., 113 F.2d 266, certiorari denied Standard Gas & Electric Co. v. Taylor, 311 U.S. 699, 61 S.Ct. 138, 85 L.Ed. 453, lends some support to appellants' contention. However, the ruling is based largely upon three cases, one of which was American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., supra, 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949, which involved secured claims rather than unsecured claims, and two cases involving interest on tax claims which were decided contrary to and prior to the ruling in City of New York v. Saper, supra. [336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710] These cases furnish no real support for the ruling."

With this discussion of the principal cases urged by the Banks, I come to the two cases I deem to be the most nearly in point. Both were decided in 1974, and both support the position of the Indenture Trustees. The first is Time Sales Finance Corporation (1974) 3 Cir., 491 F.2d 841. That was a reorganization under Chapter XI, and subordinated debentures had been issued by Time Sales.

---

3. The allowance of post petition interest may have been proper under principles of equitable subordination required by the fraud pervading the entire transaction. See, Pepper v. Litton (1939) 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.

Those debentures contained a subordination provision reading:

> "In the event of any liquidation, dissolution or winding up of the company or of any receivership, insolvency, bankruptcy, liquidation, readjustment, reorganization or other similar proceedings relative to the company or its creditors or its property, *all principal and interest owing on all superior indebtedness of the company shall be paid in full before any payment is made on Five Year Debenture Notes . . . .*" [Emphasis by the court]

The case affirmed a District Court ruling that the subordination provision did not permit payment of post petition interest to creditors whose debts were there described as "superior indebtedness."

The Third Circuit said:

> "Central Penn contends that, in the specific circumstances here, the referee and the district court erred in reading section 63(a)(1) to prevent post-petition interest. It asserts that the general rule articulated in section 63(a)(1)—the bankrupt's financial position on the date of the filing of the petition controls during the subsequent winding up of its affairs—is not immutable, and in certain situations interest accruing subsequent to the filing of the petition is recoverable.

> "Further, it is clear, according to Central Penn, that it is within the equity powers of the bankruptcy court to give effect to a subordination agreement during the distribution of a bankrupt's assets. Central Penn strongly urges that the class of exceptions to the general rule be extended to include post-petition interest where, as here, there is a subordination agreement.

> "Addressing the requirements relating to proof of claim in section 57(a) and General Order 21(1), Central Penn also asserts that at the time it filed its proof of claim there was attached the three notes payable to it that had been executing (sic) by the

bankrupt providing for 'interest from date,' and that, therefore, its proof of claim regarding post-petition interest did conform to the requirements of section 57(a) and General Order 21 (1).

> "We need not decide, at this time, whether the narrow group of exceptions to the general rule that 'everything stops' at the date the petition is filed is to be expanded to include the situation here. Neither do we need to decide whether Central Penn's proof of claim adequately presented its demand for post-petition interest or, if such demand is to be regarded as insufficient, whether the insufficiency is to operate to bar Central Penn from otherwise asserting its claim.

> "Instead, the district court's conclusion that the subordination provision contained in the debenture notes did not appropriately apprise the debenture note holders that their claims against the bankrupt would be subordinated to Central Penn's demand for post-petition interest is not incorrect and, thus, is adequate to sustain its order denying Central Penn's claim for post-petition interest. Certainly, in light of this conclusion of the district court, we cannot say that its refusal to allow post-petition interest constituted an abuse of the discretion it has with regard to the exercise of its equitable power. If a creditor desires to establish a right to post-petition interest and a concomitant reduction in the dividends due to subordinated creditors, the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-a-vis these parties.

> "When we are confronted with an instrument that satisfactorily indicates that subordinated creditors were put on notice that superior creditors may be entitled to interest up to the date of actual distribution and, of course, the rules regarding the assertion of

the claim have been complied with, we may then be called upon to determine whether the language of section 63(a)(1) and the policies underpinning the Bankruptcy Act permit the payment of post-petition interest from the bankrupt's estate where some of the creditors have agreed to subordinate their claims against the bankrupt to those of other creditors."

Kingsboro Mortgage Corporation (1974) D.C.S.D.N.Y., 379 F.Supp. 227 (on appeal to the Second Circuit) adopts *Time Sales Finance Corporation.* In *Kingsboro,* the decision of the Bankruptcy Judge allowing the post petition interest on subordinated debentures was reversed. The subordination agreement in *Kingsboro* provided:

"(b) In the event of any insolvency, liquidation, reorganization or other similar proceedings, or any receivership proceedings in connection therewith, relative to the Company or its creditors or its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of the Company whether or not involving insolvency or *bankruptcy proceedings, then all principal and interest on all Senior Debt shall first be paid in full,* or such payment shall have provided for, *before any payment on account of principal or interest is made upon the Notes* [junior debt].

.   .   .

"(d) In any of the proceedings referred to in paragraph (b) above, any payment or distribution of any kind or character, whether in cash, property, stock or obligations which may be payable or deliverable in respect of the Notes shall be paid or delivered directly to the holders of the Senior Debt for application in payment thereof, *unless and until all principal and interest on all Senior Debt shall have been paid in full.*   .   .   .   [Emphasis added]"

The District Judge quoted at length from Times Sales Finance Corporation, and he held:

"Rather than being in conflict with the decision of the Second Circuit in In re Credit Industrial Corp., supra, [2nd Cir., 366 F.2d 402] as appellees contend, Time Sales is in complete accord with the rationale of that earlier case. As was stated, supra, Credit Industrial clearly stands for the proposition that lawful subordination agreements must be enforced in bankruptcy according to their terms and that junior creditors may not receive funds which they have 'explicitly agreed not to accept.' Time Sales does not deviate from this view nor does it exact a more stringent requirement in instances such as at bar. The rule established by Time Sales, that before a right to 'post-petition' interest and a concomitant reduction in dividends to subordinated creditors may be recognized, 'the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-a-vis these parties,' is no more than a rule of 'explicitness' wholly consistent with that enunciated in the Credit Industrial case.

"On the record before it, this Court can not view the provisions contained in the subordination agreement, which are to the effect that no payment shall be made to the subordinated creditors 'unless and until all principal and interest on all Senior Debt shall have been paid in full,' when taken in a context of specific reference to 'bankruptcy proceedings', as sufficiently clear and explicit as would preclude the operation of the general and accepted rule that 'everything stops' on such date as the petition in bankruptcy is filed. Upon the standard established in Time Sales, precise, explicit and unambiguous language must be contained in the subordination agreement to the effect that the contract abrogates the general rule regarding interest, in order that a right to 'post-petition' interest prior to the payment of dividends to junior creditors may be established."

A comparison of Sec. 5.03 of the KRC Indentures with those in *Time Sales* and *Kingsboro Mortgage* discloses a marked degree of similarity and mandates a like result. To permit the spin-up requested by the Banks would effectively subordinate the debenture holders to the Banks, and, additionally, the final result would be that the debenture holders receive less pro rata than will trade creditors. The debenture holders did not subordinate to trade creditors. In fact, Sec. 5.05 of the Indenture says that the holders of the debentures are subrogated to the rights of Senior Debt until the debentures are paid in full. Of course, since all admit that post petition interest cannot be claimed against the debtor, this subrogation provision can't come into play, but with this provision in mind, it surely cannot be said that the Banks have sustained the burden imposed upon them by *Time Sales Finance Corporation:*

> "If a creditor desires to establish a right to post-petition interest and a concomitant reduction in the dividends due to subordinated creditors, *the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-a-vis these parties.*"

If the Banks can rely on the Indentures to receive post petition interest, the indenture holders should be entitled to rely on their subrogation rights, but no one is so bold as to argue that by virtue of their subrogation rights, the debenture holders can claim over against trade creditors.

Arguably, perhaps, the KRC Indentures can be read the way the Banks want to read them, but they can also be read as failing to tell the debenture holders that they would have to pay the Banks post petition interest in event of reorganization.[4] Moreover, I am unimpressed with the Banks' argument that in making the loans they carefully

thought about a reorganization and relied upon payment of post petition interest by the debenture holders by way of a spin-up of stock in a reorganized company. Counsel have argued this, but the record is barren of evidence to this effect, and Bankers don't customarily loan money to companies they think are going into reorganization.

 Equity and good conscience require that where the debtor is insolvent, post petition interest not be paid to one class of unsecured creditors by another class of unsecured creditors. The reasons for this are enunciated in American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry. Co., 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949, supra. If the rule were otherwise, delay inures to the benefit of the Banks, and, with the passage of time, the debenture holders could be wiped out. The requested spin-up of stock to take care of post petition interest cannot be allowed.

4. In a different context, a similar result was reached by Judge Doyle in Re Joe Newcomer

Finance Company (1964) D.C.Colo., 226 F. Supp. 387.