In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc., and Bar Harbor Airways, Inc., d/b/a Eastern Express, Debtors.

FIRST FIDELITY BANK, NATIONAL ASSOCIATION, NEW JERSEY, Plaintiff,

v.

MIDLANTIC NATIONAL BANK, as trustee, United Jersey Bank, as trustee, the Connecticut National Bank, as trustee, Eastern Air Lines, Inc., as debtor and M.R. Shugrue, Jr., as chapter 11 trustee, Defendants.

Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL) and 91 B 10287 (BRL).
Adv. No. 91–5238A.

United States Bankruptcy Court, S.D. New York.

Dec. 18, 1991.

See also 134 B.R. 515.

Weil, Gotshal & Manges, New York City by Matthew Cantor, for Trustee.

Bruce H. Roswick, New York City, Riker, Danzig, Scherer, Hyland & Perretti, Newark, N.J. (Dennis J. O'Grady, of counsel), for First Fidelity Bank, N.A. as Collateral Trustee.

Gibson, Dunn & Crutcher, New York City (Mitchell A. Karlan, and Stephen A. Kaplan, of counsel), for Connecticut Nat. Bank as Third Series Trustee.

Clapp & Eisenberg, P.C., Newark, N.J. (Karen L. Gilman, of counsel), for United Jersey Bank as Second Series Trustee.

Shanley & Fisher, P.C., New York City (Robert K. Malone, A. Dennis Terrell, and Susan M. Wortman, of counsel), for Midlantic Nat. Bank as First Series Trustee.

MEMORANDUM DECISION ON THE MOTIONS OF COLLATERAL TRUST-EE AND SERIES TRUSTEES SEEK-ING INSTRUCTIONS

BURTON R. LIFLAND, Chief Judge.

## BACKGROUND

Eastern Air Lines, Inc. ("Eastern") and First Fidelity Bank, National Association, New Jersey ("FFB" or "First Fidelity") executed a Secured Equipment Indenture and Lease Agreement dated as of November 15, 1986 (the "Indenture").[1] The Indenture provided for the issuance of. $500 million in face amount of Secured Equipment Certificates in three series, as follows: First Priority Secured Equipment ("First Series") Certificates in an aggregate principal amount of $200 million due November 15, 1993 and bearing interest at the rate of 11¾% per annum, Second Priority Secured Equipment ("Second Series") Certificates in an aggregate principal amount of $200 million due November 15, 1996 and bearing interest at the rate of 12¾% per annum, and Third Priority Secured Equipment ("Third Series") Certificates in an aggregate principal amount of $100 million due November 15, 2001 and bearing interest at the rate of 13¾% per annum. Semi-annual interest payments on each of the certificates were due on May 15 and November 15 of each year.

To secure repayment of the Certificates, Eastern granted FFB all of Eastern's right, title and interest in and to a certain pool of aircraft and engines (collectively, the "Collateral" or "Collateral Aircraft").[2] Simultaneously, First Fidelity "leased" the Collateral to Eastern until such time as Eastern satisfied all of its "rent" obligations under the Indenture.[3] These obligations were equal to the payments required to pay principal, premium (if any) and interest on all outstanding Certificates, as well as payment of all fees and expenses of the Collateral Trustee in performing its role under the Indenture. First Fidelity was directed to collect "rent" payments from Eastern and to distribute them according to the respective priorities set forth in the Indenture. First Fidelity had no obligation to pay principal or interest on the Certificates except to the extent of Eastern's payments and, upon a default, the sale proceeds of the Collateral. Eastern, however, unconditionally guaranteed payment of interest and principal on the Certificates. The Indenture provides for the respective priorities of repayment to the three series of Certificateholders.

The Indenture was amended by a Second Supplemental Indenture dated as of February 13, 1987, which continued FFB as the Collateral Trustee, and designated Midlantic National Bank as First Series Trustee, United Jersey Bank as Second Series Trustee and First Jersey National Bank[4] as Third Series Trustee.

On March 9, 1989 (the "Petition Date") Eastern filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Code" or "Bankruptcy Code"). As of the Petition Date, the aggregate outstanding principal amount of certificates was approximately $453,765,000, allocated as follows: First Series Certificates in the approximate prin-

---

1. The Indenture provides that the Indenture and Secured Equipment Certificates issued thereunder shall be governed by and construed in accordance with the laws of the State of New York (Section 13.03 of the Indenture).

2. The Indenture provides for the Certificateholders to be comfortably oversecured at all times. The value of the Collateral was to be at least 133% of the value of the outstanding principal owed under the Certificates. Indenture §§ 5.05(c), 5.19. In fact, since Eastern failed to meet the net worth requirement of the Indenture, the required collateral ratio had increased to 150% before the filing of Eastern's bankruptcy petition. Indenture § 5.20.

3. Although the transaction was called a sale/leaseback (with First Fidelity issuing the certificates in its name, using the proceeds to "buy" the Collateral Aircraft, then leasing them back to Eastern), the parties do not dispute that it was not in fact a true lease, but a secured financing.

4. National Westminster Bank NJ, formerly known as First Jersey National Bank, was succeeded as Third Series Trustee on August 31, 1990 by The Connecticut National Bank ("CNB").

cipal amount of $187,934,000; Second Series Certificates in the approximate principal amount of $168,665,000; and Third Series Certificates in an approximate principal amount of $97,166,000.

Prior to the Petition Date, Eastern made all semi-annual interest payments. Although Eastern paid the semi-annual interest payment which became due on May 15, 1989, Eastern has failed to make any of the semi-annual interest payments which became due on and after November 15, 1989.

During Eastern's Chapter 11 case, Eastern sold and sub-leased a substantial portion of the Collateral Aircraft pursuant to § 363 of the Bankruptcy Code. In accordance with the Indenture and this Court's orders, the proceeds of said sales and subleases (the proceeds and Collateral Aircraft are collectively referred to as the "Collateral") were deemed to be cash collateral. Under the Indenture, the Trustee retained a perfected security interest in such cash collateral without further action. Eastern deposited substantially all of the cash collateral in a segregated bank account. As of January 28, 1991, the amount of the Certificateholders' cash collateral was approximately $232,000,000.

By motion dated November 14, 1990, First Fidelity and the Series Trustees filed a joint motion for adequate protection, or in the alternative, relief from the automatic stay. On January 19, 1991, before the motion was resolved, the Trustee terminated Eastern's ongoing airline operations and commenced an orderly liquidation of Eastern's assets.

By stipulation and orders dated January 23 and January 24, 1991 (the "Stipulations"), Eastern, the Collateral Trustee and the Series Trustees agreed among other things, to relief from the automatic stay and to Eastern's turnover of all Collateral to the Collateral Trustee. The Stipulations also required the creation of a $12 million reserve for potential § 506(c) claims by Eastern and the Trustee, and Eastern's retention of $5 million of the Proceeds to satisfy the costs of preserving, maintaining, insuring and storing the Collateral Aircraft.

Pursuant to the Stipulations, by February 11, 1991, Eastern had delivered cash, government securities and commercial paper to the Collateral Trustee in the approximate amount of $228,556,000. By April 12, 1991, the Collateral Trustee had liquidated the government securities and commercial paper to cash. As of July 30, 1991, Eastern had also delivered a portion of the remaining Collateral Aircraft to the Collateral Trustee.

Subsequent to the transfer of the Collateral from Eastern, the Collateral Trustee received conflicting instructions from the Series Trustees in regard to the payment of First Series Certificates. On March 7, 1991, the Collateral Trustee in accordance with the terms of the Indenture and New York Law, filed an adversary proceeding and its motion requesting judicial instructions from this Court.

On March 27, 1991, LNC Investment Inc., Charter National Life Insurance Company and Magten Asset Management Corporation (the "Petitioners") dissatisfied with FFB's stewardship over the Collateral, filed an involuntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey against the Secured Equipment Trust of Eastern Air Lines, Inc. (the "Involuntary Petition"). On April 24, 1991, an order was entered by the New Jersey court transferring the venue of the Involuntary Petition to this Court. The automatic stay imposed by the Involuntary Petition stayed all activity with respect to this adversary proceeding, and delayed the distribution of the Collateral.

On May 23, 1991, this Court entered an order granting a motion to dismiss the Involuntary Petition after Petitioners failed to post a bond in the amount of $10 million as required by a prior order. Although an appeal of the dismissal order is currently before the United States District Court for the Southern District of New York, the automatic stay has been dissolved by the consent of the parties and by operation of law.

After dismissal of the Involuntary Petition, the Second Series Trustee sought an

order directing the Collateral Trustee to distribute an amount of Proceeds equal to the principal amount outstanding on the First Series Certificates. On June 10, 1991, this Court granted UJB's request and entered an Order dated June 12, 1991 ordering Collateral Trustee to provide notice to the holders of First Series Certificates that an amount equal to the outstanding principal of $187,934,000 would be made available for payment. The Collateral Trustee, in conjunction with Eastern, issued a notice on July 9, 1991 establishing July 19, 1991 as the Record Date for purpose of identifying holders of First Series Certificates and July 24, 1991 as the payment date.

The Collateral Trustee brought this controversy before the Court after he received conflicting instructions from two of the Series Trustees regarding appropriate distribution of the remaining Collateral. Through separate summary judgment motions, the Collateral Trustee and the various Series Trustees seek an order from this Court interpreting the Indenture and directing the Collateral Trustee's appropriate distribution of the Collateral within the context of Eastern's Chapter 11 case and in a manner consistent with the Indenture. The motions essentially seek the same declaratory relief.

## DISCUSSION

### A. Introduction.

The Supreme Court has said that "it is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946). With this principle in mind, this Court is asked to determine: (1) whether, under 11 U.S.C. § 506(b), the debtor is required to pay post-petition interest, and (2) under 11 U.S.C. § 510(a), how the concededly insufficient collateral will be apportioned and distribut-

ed (as principal and interest) among the three series of certificate holders.

### B. Section 506(b)—Post–Petition Interest from the Debtor.

■ The general rule in bankruptcy is that "interest on debtors' obligations ceases to accrue at the beginning of the proceedings." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946). If the value of the collateral is less than the amount of the claim, then the creditor is undersecured. An undersecured claim is broken down into two separate claims: a secured claim to the extent of the value of his collateral and an unsecured claim for the deficiency. *See* 11 U.S.C. § 506(a). No interest accrues on an undersecured claim post-petition. *See United Sav. Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 372–373, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988).

Section 506(b) of the Bankruptcy Code sets forth an exception to the general rule.[5] It states that:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Thus, to the extent a claim is oversecured, the creditor is entitled to post-petition interest. A creditor is oversecured to the extent that the value of his collateral exceeds his claim.

In order to decide whether a claim exists against Eastern for post-petition interest, it must be determined whether, under § 506(b), the three series hold three separate secured claims or are co-owners of one secured claim. Put another way, this Court must determine whether the First Series is the sole owner of an oversecured

---

**5.** Interest can also be paid on an unsecured claim if the debtor proves to be solvent. No party has suggested that this is a possibility in this case.

claim of $187,934,000 or is simply a part owner of an undersecured claim of $453,-765,000.

■ Turning to the Indenture, it is undisputed that only one lien was granted to cover all three series of Certificateholders. Nevertheless, the First Series Trustee argues that because there were three separate Trustees appointed to represent three separate and distinct truncations of debt which have differing interest rates, staggered maturity dates and different levels of priority, each Series represents a separate claim against the Debtor under § 506(b). The parties have not cited and this Court has not located any cases that hold that the granting of one lien can give rise to more than one secured claim. While § 506(a) bifurcates an undersecured claim into two claims, one secured and one unsecured, there is no indication in the Code that any similar procedure should be followed to allow separate secured claims to separate classes of certificateholders who jointly hold one lien.

The First Series Trustee suggests that the relationship of the parties should be viewed the same as senior and junior mortgagees, citing *In re James B. Downing & Co.*, 94 B.R. 515 (Bankr.N.D.Ill.1988).[6] In that case, however, there were separate mortgages against the property. Those mortgages created separate claims. It is clear that if the three Series held separate liens against the Collateral, then the First Series would be oversecured and would be entitled to post-petition interest, but that is not the structure of this transaction. The Debtor granted only one lien, only one secured claim, in favor of all of the Certificateholders. How the rights to proceeds of the lien collateral were to be distributed under the Indenture was an intramural matter for the Collateral Trustee and the various series, not the Debtor. According-

ly, the fact that three proofs of claim were filed against the Debtor by the individual Series Trustees cannot change the number of claims that arise out of the single pool of Collateral. Thus, the Indenture provided for one secured claim against Eastern and that claim is undersecured. Eastern is not liable for post-petition interest.

**C. Section 510(a)—Inter-creditor Subordination.**

Having concluded that interest ceased to accrue against the Debtor on the filing date, the total claim of the three groups of Certificateholders against the estate is $453,765,000. Since there is not sufficient Collateral to cover this claim,[7] the rights of the Certificateholders vis-a-vis each other must still be resolved. The First Series claims that it is entitled to recovery of post-petition interest from the Collateral before the junior series recover any principal.[8] Payment of this interest may have the effect of sharply reducing or eliminating recovery for the Third Series because while the First Series' claim for interest increases, the Certificateholders' aggregate claim against the Debtor remains the same. Thus, the First Series can only receive their interest payments out of the potential dividends of one or more of the subordinated series.

Under 11 U.S.C. § 510(a), full effect must be given to pre-bankruptcy subordination agreements. This provision states:

> A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

Prior to the enactment of the Bankruptcy Code and § 510(a), subordination provisions were enforced through the bankruptcy

---

**6.** This is the only case cited by Midlantic in support of its § 506(b) argument that it is entitled to interest on its "oversecured" claim.

**7.** In the current market, it is beyond dispute that the Collateral values fall far below the amount of the total principal claim.

**8.** Only the Third Series has objected to the payment of post-petition interest to the First Series. The Second Series apparently assumed that the Debtor would be held liable for post-petition interest and did not clearly state its position in the event that Eastern was not liable for such interest.

court's equitable powers.[9] Pre-code cases placed a heavy burden on senior creditors who sought to recover post-petition interest from dividends that would otherwise have been available to junior creditors. In *Matter of Times Sales Finance Corp.*, 491 F.2d 841, 844 (3d Cir.1974), the Third Circuit held that:

> If a creditor desires to establish a right to post-petition interest and a concomitant reduction in the dividends due to subordinated creditors, the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended. . . .

The Court of Appeals affirmed the district court's finding that the indenture was not sufficiently precise, stating "we cannot say that [the district court's] refusal to allow post-petition interest constituted an abuse of the discretion it has with regard to the exercise of its equitable power." *Id.* at 844.

The Second Circuit followed *Time Sales* in *In re Kingsboro Mortgage Corp.*, 514 F.2d 400 (2d Cir.1975). *Kingsboro* adopted the *Time Sales* holding that unequivocal language is necessary to overcome the general rule that interest stops accruing upon the filing of a bankruptcy petition.[10] The Court of Appeals appeared concerned that subordinated Certificateholders could not be said to have waived their right to such a well known policy unless the language of the agreement is explicit.

The Tenth Circuit followed suit in *Matter of King Resources Co.*, 528 F.2d 789, 791 (10th Cir.1976):

> In the instant case, as in *Kingsboro* and *Time Sales*, the subordination provisions make no specific reference to the question of post-petition interest. The holding in both *Kingsboro* and *Time Sales* is that where the subordinating provisions are unclear or ambiguous as to whether post-petition interest is to be allowed a senior creditor, the general rule that interest stops on the date of filing of the petition in bankruptcy is to be followed.

Since the enactment of the Bankruptcy Code and section 510(a), enforcement of subordination provisions is no longer solely an application of the court's equitable powers. It is mandated by statute. In fact, as the Supreme Court has stated in *Norwest Bank Worthington, et al, v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988), "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." Thus, one might argue that *Kingsboro* is inconsistent with § 510(a) in that the burden of explicitness placed on senior creditors attempting to establish rights to post-petition interest is too great. The parties have not cited any Bankruptcy Code cases that discuss *Kingsboro*.[11] However, the First Series Trustee has not disputed the continuing validity of *Kingsboro* and it is not clear to this Court that it is inconsistent with

**9.** *See Matter of Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir.1966) ("A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have 'explicitly agreed not to accept them.'") (citation omitted).

**10.** *Time Sales* noted that the type of inter-creditor subordination agreement that the First Series seeks to enforce might be unlawful and unenforceable, because it is contrary to bankruptcy policy. 491 F.2d at 845. The Third Series argues that this issue remains unresolved today. This argument is frivolous, however. It is clearly contrary to § 510(a) and was specifically rejected in *Kingsboro:*

> We need not pass upon the validity between creditors of an agreement subordinating jun-

ior indebtedness to post-bankruptcy interest on the senior debt. Our own *In re Credit Industrial Corp.*, 366 F.2d 402, 408 (2nd Cir. 1966), contains language broad enough to permit any such a provision despite Bankruptcy Act policies vis a vis the bankrupt estate. *Kingsboro* at note 2.

**11.** The only commentary of any kind that considers the application of these decisions to cases decided under the Code questions their continuing validity. Roe, Mark J., Commentary on "On the Nature of Bankruptcy": Bankruptcy, Priority, and Economics, 75 Va.L.Rev. 219, note 48 ("These cases may be inconsistent with the Code's new mandate that subordination provisions be enforceable in bankruptcy to the same extent that they were enforceable under non-bankruptcy law.")

§ 510(a). Therefore, this Court concludes that *Kingsboro* retains its vitality and remains the controlling law in the Second Circuit.

In *Kingsboro*, the Court of Appeals noted two important factors that lead it to the conclusion that the indenture was not sufficiently clear to establish that the senior noteholders were entitled to post-petition interest. First, the indenture did not specifically mention "post-petition interest". 514 F.2d at 401. Second, the provision that the senior debt relied upon in claiming post-petition interest defined the rights of the noteholders versus the debtor, not versus other noteholders. 514 F.2d at 402. Therefore, the provision was "insufficiently express to relate to post-bankruptcy interest." *Id.* at 401. In fact, it appears that the Court of Appeals was unconvinced that it was the intent of the drafters of the indenture to subordinate the principal claims of junior holders to the interest claims of senior holders. Certainly, the indenture did not satisfy the rule of explicitness as originally set forth in *Time Sales*.

## THE EASTERN INDENTURE

■ While the provision at issue in *Kingsboro* was similar to the subordination provision at issue in this case, the First Series Trustee points out that the Eastern Indenture is distinguishable on the two points that the court highlighted in *Kingsboro*.

The Eastern Indenture does specifically mention "post-petition" interest. The relevant provisions from the Indenture are 1.01 and 12.02.[12] Section 1.01 states in pertinent part:

*Definitions.* The terms defined in this Section 1.01 (except as otherwise expressly provided or unless the context otherwise requires) for all purposes of this Agreement or of any agreement supplemental hereto or amendatory hereof shall have the respective meanings specified in this Section 1.01 ...

*Senior Certificates* shall mean, in the case of the Second Certificates, all amounts owing on the First Certificates (including post-petition interest) and, in the case of the Third Certificates, all amounts owing on the First Certificates and the Second Certificates (including post-petition interest).

Section 12.02 then provides for subordination as follows:

the holders of all Senior Certificates shall first be entitled to receive payment in full in accordance with the terms of such Senior Certificates of the principal thereof and premium, if any, and the interest due thereon before the holders of the Subordinated Certificates are entitled to receive any payment upon the principal of, premium, if any or interest on the Subordinated Certificates...."

Thus, while section 12.02 does not contain the words "post-petition interest", this term is incorporated into the section through the use of the defined term "Senior Certificates".

The Indenture is also distinguishable from the *Kingsboro* indenture in that Section 12.02 is clearly an inter-creditor subordination provision, not simply a debtor-creditor rights provision. The terms of Article 12 leave no room for argument to the contrary. Article 12 begins:

## ARTICLE TWELVE SUBORDINATION OF SECOND CERTIFICATES AND THIRD CERTIFICATES

SECTION 12.01. *Covenant of Company and Holders of Second Certificates*

---

12. The First Series Trustee asserts that it is unequivocally clear that section 12.02 is the provision of the Indenture that governs distribution of the Collateral under the circumstances before the Court. The Third Series Trustee disputes this contention on a number of grounds. As the First Series Trustee points out, Article 12 does clearly state that its provisions apply to: any payment or distribution of assets of the Company in connection with any dissolution, winding up, liquidation or reorganization or the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Company or otherwise). Nevertheless, it is unnecessary for this Court to decide this dispute because not even section 12.02 provides the type of explicit notice regarding post-bankruptcy interest required under *Kingsboro*.

*and Third Certificates.* The Company, for itself, its successors and assigns, covenants and agrees, *and each holder of Subordinated Certificates, by his acceptance thereof, likewise covenants and agrees,* that the payment of the principal of and premium, if any, and interest on each and all of the Subordinated Certificates is hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full of all Senior Certificates (emphasis added).

Thus, under section 12.01, all of the Certificateholders expressly agreed to the subordination provisions of section 12.02. *See* text of 12.02 *supra.*

Despite these distinguishing factors, this Court cannot find that the Indenture meets the rule of explicitness adopted in *Kingsboro.* The Third Series Trustee argues that the Eastern Indenture lacks that degree of explicitness that would require preemptive interest payments in favor of senior holders. Section 12.02 uses the term "Senior Certificates" which is defined in Section 1.01 to include "all amounts owing (including post-petition interest)." Had the Indenture remained oversecured, post-petition interest clearly would have been an "amount owing" on the allowed, secured

claim, and post-petition interest would be paid from the Collateral held by the Collateral Trustee in the specified order of priority. But the debt secured by the Collateral is undersecured, and therefore it could be argued that "amounts owing" to the Certificateholders cannot include post-petition interest because under § 502(b) post-petition interest is not "owing" (from the Debtor). The First Series Trustee urges that "post-petition interest" must be interpreted to mean not only interest that accrues against the Debtor, but also interest out of the Collateral at the expense of the junior holders. However, it would not be unreasonable for a Certificateholder to conclude that "post-petition interest" only refers to interest that accrues against the Debtor.[13] Indeed, this latter interpretation is the more plausible one.[14] In sum, the Eastern Indenture "can be read the way the [senior series] want to read [it], but [it] can also be read as failing to tell the [junior series] that they would have to pay the [senior series] post-petition interest in the event of reorganization." *In re King Resources Co.,* 385 F.Supp. 1269, 1281 (D.Colo.1974), *aff'd,* 528 F.2d 789 (10th Cir.1976).

Therefore, the subordination provision is at least ambiguous and does not provide unequivocal notice that amounts that would

**13.** It should be noted that this ambiguity could not have arisen in *Kingsboro, Time Sales,* or *King Resources.* Those cases all dealt with unsecured debt. Consequently, had the indentures at issue specifically referenced "post-petition interest" as an accrual obligation favoring the seniors, it would have been clear that this interest would have been at the expense of the junior series. Post-petition interest could not accrue against the debtors. *See* § 502(b) and *Kingsboro supra.*

In this case, if the Certificateholders had remained oversecured as contemplated in the Indenture, post-petition interest would have continued to accrue against the Debtor. Whether post-petition interest was intended to continue to accrue when the debt is undersecured is not clear from the Indenture. Under these circumstances, this Court cannot find that the inclusion of the phrase "post-petition interest" gives the Indenture the unambiguous meaning required by Kingsboro.

**14.** As an illustration of explicit language, the Third Series Trustee provides the following provision from another indenture under which it acts as a trustee:

*Liquidation; Dissolution; Bankruptcy.*
Upon any distribution to creditors of the Company in a liquidation or dissolution of the Company or in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property or in an assignment for the benefit of creditors or any marshalling of the assets and liabilities of the Company:

  (1) holders of Senior Debt shall be entitled to receive payment in full of all Obligations with respect to the Senior Debt *(including interest after the commencement of any such proceeding at the rate specified in the applicable Senior Debt, whether or not such interest is an allowable claim in any such proceeding)* before Securityholders shall be entitled to receive any payment of any Obligations with respect to the Securities; and

  (2) *until all Obligations with respect to Senior Debt (as provided in subsection (1) above) are paid in full, any distribution to which Securityholders would be entitled but for this Article shall be made to holders of Senior Debt, as their interests may appear....*
CNB reply brief at p. 10–11.

otherwise have been owing from Eastern if the claim had been oversecured must be made up out of the principal claim of the junior Certificateholders. In the absence of such language apprising the junior Certificateholders that "amounts owing" includes the equivalent of post-petition interest to be carved out of the junior Certificateholder's principal claim, section 12.02, the subordination provision of the Indenture, does not meet the rule of explicitness.

## CONCLUSION

For the foregoing reasons, (1) the three series of Certificateholders are joint holders of an undersecured claim and are not entitled to interest from Eastern; and (2) since the Indenture is not sufficiently explicit, none of the Certificateholders is entitled to payment of interest from the Collateral before the principal claims of all Certificateholders are satisfied in full.

The parties are instructed to submit an order consistent with this opinion.