**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-4436

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/28/98
THOMAS K. KAHN
CLERK

D. C. Docket No. 95-2045-CIV-FAM

In Re: SOUTHEAST BANKING CORPORATION,

                                                    Debtor.

CHEMICAL BANK, as Indenture Trustee under the Indenture, dated as
of March 1, 1983, of Southeast Banking Corporation, and GABRIEL
CAPITAL, L.P.,

                                        Plaintiffs-Appellants,


                        versus


FIRST TRUST OF NEW YORK, NATIONAL ASSOCIATION, as Indenture
Trustee, THE BANK OF NEW YORK, as Indenture Trustee, and
SOUTHEAST BANKING CORPORATION, Debtor,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(September 28, 1998)**


Before EDMONDSON and BIRCH, Circuit Judges and FAY, Senior
Circuit Judge.

# BIRCH, Circuit Judge:

This appeal requires us to decide whether Congress, by

enacting section 510(a) of the 1978 Bankruptcy Code, intended to

abrogate the "Rule of Explicitness," a judicially created doctrine that prevents a senior creditor from collecting post-petition interest from a junior creditor pursuant to a subordination agreement unless the agreement expressly provides for that result. The bankruptcy court and the district court both held that section 510(a) was not inconsistent with the Rule of Explicitness and that the legislative history accompanying section 510(a) revealed no intent to repeal the rule. As a result, the bankruptcy court and the district court declined to read section 510(a) as a radical departure from previous law governing the interpretation and enforcement of subordination agreements and held that, because the agreements in question did not satisfy the Rule of Explicitness, the Senior Creditors were not entitled to receive post-petition interest from the Junior Creditors. Accordingly, the district court entered summary judgment against the Senior Creditors. We REVERSE in part and CERTIFY the substance of this dispute to the New York Court of Appeals.

## BACKGROUND

On September 20, 1991 (the "petition date"), Southeast Banking Corporation ("Southeast") filed a voluntary bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code.[1] On April 28, 1992, the bankruptcy court entered an order confirming William A. Brandt, Jr. ("Brandt") as the successor Chapter 7 trustee for Southeast's estate.

Appellant, The Chase Manhattan Bank ("Chase"), formerly Chemical Bank, is the indenture trustee (the "Senior Trustee") under an Indenture, dated March 1, 1983 (the "Senior-Indenture"), pursuant to which Southeast issued $60 million in principal amount of unsecured notes (the "Senior Notes"). Appellant, Gabriel Capital, L.P. ("Gabriel"), together with three of its affiliates, holds a substantial portion of the Senior Notes. The Senior

---

[1] The procedural and factual history of this case and the transactions on which it is based are extensive and complex. We have attempted to limit our factual discussion to that which is necessary to understand the issues on appeal. The published opinions of the bankruptcy court and the district court provide greater detail. See Chemical Bank v. First Trust of New York, N.A. (In re Southeast Banking Corp.), 188 B.R. 452 (Bankr. S.D. Fla. 1995), aff'd 212 B.R. 682 (S.D. Fla. 1997).

Indenture[2] provides that Southeast has a continuing obligation to repay principal and interest on the Senior Notes and that, upon the event of a default, Southeast will pay the entire amount of principal and interest due on the Senior Notes, including interest until the date of payment upon overdue principal, and to the extent enforceable, interest upon the overdue interest at the same rate specified in the Senior Notes. Finally the Senior Indenture provides that, in the event of a default, Southeast also shall be liable to the Senior Trustee for reasonable fees and costs of collection, including attorneys' fees.[3]

---

[2] Unfortunately, although the parties quoted the Senior Indenture and the relevant subordination agreements in their briefs, they failed to make those agreements part of the record on appeal. To the extent we quote those agreements, we have relied on the district court's published opinion which reproduces the relevant portions of those agreements in the text and appendix. We note that, although the parties have disagreed over the meaning and significance of the language of these agreements, they have not contested the literal contents of the contracts.

[3] The Senior Indenture provides that in the event of a default:
[Southeast] will pay to the [Senior] Trustee for the benefit of the Holders of the [Senior Notes] of such series the whole amount that then shall have become due and payable on all [Senior Notes] of such series for principal or interest, as the case may be (with interest to the date of such payment upon the overdue principal and, to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest at the same rate as the rate of interest . . . specified in the [Senior Notes] of such series); and in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the [Senior] Trustee and each predecessor

4

Appellees, First Trust of New York, N.A. and The Bank of New York (collectively the "Junior Trustees") are indenture trustees under five indentures (the "Subordinated Indentures") pursuant to which Southeast issued in excess of $300 million in principal amount of subordinated notes ("the Subordinated Notes"). Each of the Subordinated Indentures[4] contains language that subordinates collection on the Subordinated Notes to the prior payment in full on the Senior Notes. The Subordinated Indentures also provide that, upon Southeast's bankruptcy or liquidation, the holders of the Senior Notes must be paid in full before Southeast can make any payment on the Subordinated Notes and that all payments otherwise allocable to the holders of the Subordinated Notes must be paid to the holders of the Senior

---

trustee, their respective agents, attorneys and counsel, and all advances made, by the [Senior] Trustee and each predecessor trustee except as a result of its negligence or bad faith.

In re Southeast, 212 B.R. at 684 (S.D. Fla. 1997)(quoting Senior Indenture § 5.2).

[4] Although the Subordinated Indentures are not identical in relevant part, the bankruptcy court held that "the legal effect of the minor variations between the [Subordinated] Indentures is immaterial" for the purposes of this case, In re Southeast, 188 B.R. at 460 (Bankr. S.D. Fla. 1995), and the district court affirmed that conclusion, see In re Southeast, 212 B.R. at 685 (S.D. Fla. 1997). The parties have not contested this conclusion on appeal.

5

Notes, or their trustees, until such Senior Notes have been paid in full.[5]  Significantly, however, the Subordinated Indentures make no specific mention of the issue of post-petition interest or of the Senior Trustee's fees and costs for collecting post-petition interest.  Finally, each of the Subordinated Indentures includes a

---

[5]  The Subordinated Indentures entered into in 1984, 1985, 1987, and 1989, which are substantively identical in this respect, contain the following subordination clauses:

> [Southeast] . . . covenants and agrees, and each holder of a [Subordinated] Note likewise covenants and agrees by his acceptance thereof, that the obligation of [Southeast] to make any payment on account of the principal of and interest on each and all of the [Subordinated] Notes shall be subordinate and junior in right of the payment to [Southeast's] obligations to the holders of Senior Indebtedness of [Southeast], to the extent provided herein, and that in the cases of . . . any liquidation or winding-up of or relating to [Southeast] as a whole, . . . all obligations of [Southeast] to holders of Senior Indebtedness of [Southeast] shall be entitled to be paid in full before any payment shall be made on account of the principal of or interest on the [Subordinated] Notes. . . .  In addition, in the event of any such proceeding, if any payment or distribution of assets of [Southeast] of any kind or character . . . shall be received by the [Subordinated] Trustee or the holders of the [Subordinated] Notes before all Senior Indebtedness of [Southeast] is paid in full, such payment or distribution shall be held in trust for the benefit of and shall be paid over to the holders of such Senior Indebtedness . . . until all such Senior Indebtedness shall have been paid in full.

In re Southeast, 212 B.R. at 690-91 (quoting 1984 Subordinated Indenture § 11.01 and 1985 Subordinated Indenture § 11.01) (second ellipsis added); see also id. at 691 (quoting 1987 Subordinated Indenture § 1301 and 1989 Subordinated Indenture § 1301).

> The Subordinated Indenture entered into in 1972 provides in relevant part:
> Upon . . . any payment or distribution of assets of [Southeast] . . . in bankruptcy, all principal, premium, if any, and interest due or to become due upon all Senior Indebtedness shall first be paid in full . . . before any payment is made on account of the principal or, premium, if any, or interest on the Debentures . . . .

Id. at 690 (quoting 1972 Subordinated Indenture § 4.03) (second ellipsis added).

clause noting that New York law governs the enforcement and interpretation of the agreements.

Both the Senior Trustee and the Junior Trustees have filed proofs of claim as unsecured nonpriority claims on behalf of their holders in Southeast's Chapter 7 proceedings. Pursuant to the orders of the bankruptcy court, Southeast has distributed or will distribute amounts sufficient to satisfy the principal on the Senior Notes and all interest that accrued on the Senior Notes prior to the petition date. Chase, however, has not received any interest that accrued on the Senior Notes after the petition date ("post-petition interest") because, as we discuss in more detail below, the Bankruptcy Code does not provide for the recovery of post-petition interest from an insolvent debtor, such as Southeast.

Chase and Gabriel (collectively, the "Senior Creditors") commenced the above-captioned proceeding on September 23, 1994 and sought to compel the payment of post-petition interest until the date of payment on the Senior Notes (including interest

7

upon that interest), as well as the reimbursement of Chase's fees and costs associated with this action, from the distributions otherwise payable to holders of the Subordinated Debt (the "Junior Creditors").  Chase and Gabriel relied on contractual language in the Subordinated Indentures that subordinated the Junior Creditors' right to repayment to the Senior Creditors' right to receive payment in full, as well as section 510(a) of the Bankruptcy Code, which provides for the enforcement of subordination agreements.  All parties moved for summary judgment.  In addition, Brandt, Southeast's Chapter 7 trustee, filed a cross-motion for partial summary judgment and asked the bankruptcy court to declare that regardless of the disposition of the dispute between the creditors, the claims against Southeast would not increase.  Since Chase and Gabriel sought to recover post-petition interest from the distributions otherwise due the Junior Creditors, they did not contest Brandt's motion and have not done so on this appeal.

On August 8, 1995, the bankruptcy court denied Chase and Gabriel's motion for summary judgment in part, granted the Junior Trustees' cross-motion for summary judgment in part, and declared Brandt's motion for partial summary judgment moot.[6] See In re Southeast, 188 B.R. 452 (Bankr. S.D. Fla. 1995). Chase and Gabriel appealed to the district court for the Southern District of Florida, and on February 28, 1997, the district court affirmed the judgment of the bankruptcy court. See In re Southeast, 212 B.R. 682 (S.D. Fla. 1997). Both the bankruptcy court and the district court based their holdings on the judicially created, and heretofore uniformly applied, doctrine of the "Rule of Explicitness," which, effectively, prevents a senior creditor from recovering post-petition interest from junior creditors unless the subordination agreement articulates the obligation in unusually express language. Applying the same logic, the bankruptcy and district

---

[6] The bankruptcy court also granted Chase and Gabriel's motion in part and denied the Junior-Trustees' motion in part, but the parties have not challenged those aspects of the court's judgment on appeal.

9

courts denied Chase's claim for reasonable costs and fees, including attorneys' fees, incurred after the petition date. Chase and Gabriel argue that section 510(a) of the Bankruptcy Code abrogated the Rule of Explicitness and that the bankruptcy and district courts, therefore, committed legal error in applying the rule to this case. Relying on New York law that made a contract for compound interest unenforceable, prevailing at the time the parties entered the relevant contracts, the bankruptcy and district courts also rejected Chase and Gabriel's claims for compound interest (interest upon the post-petition interest). Citing recent revisions to New York law, Chase and Gabriel also urge us to reverse the district court's conclusions on the issue of compound interest.

## DISCUSSION

The parties do not contest the material facts and agree that the resolution of their dispute turns on the interpretation and application of the Bankruptcy Code and New York state law. Consequently, the issues on appeal present purely legal questions, subject to our de novo review. See Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp. (In re Piper Aircraft Corp.), 58 F.3d 1573, 1576 (11th Cir. 1995); First Bank of Linden v. Sloma (In re Sloma), 43 F.3d 637, 639 (11th Cir. 1995).

## I.    The Development of the Rule of Explicitness

The overriding theme of bankruptcy law, both past and present, has been the equitable distribution of the debtor's remaining assets among creditors. See Union Bank v. Wolas, 502 U.S. 151, 161, 112 S. Ct. 527, 533, 116 L. Ed. 2d 514 (1991) (quoting H.R. Rep. No. 95-595, at 177-78 (1977), reprinted in

1978 U.S.C.C.A.N. 6137-38)); Begier v. Internal Revenue Serv., 496 U.S. 53, 58, 110 S. Ct. 2258, 2262-63, 110 L. Ed. 2d 46 (1990); Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S. Ct. 904, 907, 85 L. Ed. 1293 (1941).  Congress evidenced its continued commitment to this policy in sections 547 and 726 of 1978 Bankruptcy Code.  See 11 U.S.C. § 726 (establishing equitable distribution among creditors); id. § 547 (permitting the bankruptcy trustee to recover certain pre-petition transfers to creditors); see also 1 David G. Epstein et al., Bankruptcy § 1-2, at 3, § 1-7, at 12 (West 1992) (describing these provisions as manifestations of the policy of equitable distribution in bankruptcy).  The courts, however, have permitted creditors to contract out of this system of pro-rata distribution by enforcing subordination agreements, whereby one creditor (the junior creditor) agrees that, in the event of a default or bankruptcy, another creditor (the senior creditor) will receive repayment in full before the junior creditor receives payment on its loans.  See Dee

Martin Calligar, Subordination Agreements, 70 Yale L.J. 376, 376-83 (1961) (describing types of subordination agreements).  Before Congress enacted the 1978 Bankruptcy Code, which includes a statutory provision regarding the enforcement of subordination agreements, the courts enforced these agreements pursuant to their equitable powers:

> [E]quitable considerations, however, require that the concept of equal distribution be applied only to creditors of equal rank, i.e., creditors who are similarly situated. Creditors who expressly agree to subordinate their claims against a debtor and the creditors for whose benefit the agreement to subordinate is executed are not similarly situated.

In re Credit Indus. Corp., 366 F.2d 402, 408 (2d Cir. 1966); see also Calligar, Subordination Agreements, 70 Yale L.J. at 389 ("[S]ubordination agreements . . . will be given effect by the bankruptcy court through the exercise of its equity power.").  In enforcing subordination agreements, however, the courts have emphasized that the junior creditor's agreement to subordinate

13

must be express.  See In re Credit Industrial Corp., 366 F.2d at

408.

The issue of post-petition interest has led to a wrinkle in the

enforcement and interpretation of subordination agreements.

Given the often lengthy delay between the debtor's petition for

bankruptcy and the date upon which a creditor can expect to

receive any payment on the underlying obligation, post-petition

interest can represent a significant amount of money.  Under both

pre-Code practice and the 1978 Bankruptcy Code, unsecured and

undersecured creditors[7] could not expect to receive interest on an

bankrupt debtor's obligation that accrued after the date of the

---

[7] An undersecured creditor is simply a secured creditor whose collateral is worth less than the debtor's obligation. Cf. Orix Credit Alliance v. Delta Resources, Inc. (In re Delta Resources, Inc.), 54 F.3d 722, 724 n.1 (11th Cir. 1995) (per curiam).  By contrast, section 506(b) of the Bankruptcy Code, permits an oversecured creditor to receive post-petition interest from the debtor to the extent the creditor's security exceeds the value of the debtor's obligation.  Id. at 729.  Only in the event that the debtor turns out to be solvent (i.e., the debtor's property at fair valuation is  sufficient to pay all debts, cf. 11 U.S.C. § 101(32)) can an unsecured or undersecured creditor expect to receive post-petition interest.  See e.g., United States v. Ron Pair Enters., 489 U.S. 235, 246, 109 S. Ct. 1026, 1033, 103 L. Ed. 2d 290 (1989) (describing pre-Code practice); Equitable Life Assurance Soc. v. Sublett (In re Sublett), 895 F.2d 1381, 1386 & n.10 (11th Cir. 1990) (applying section 506(b) of the Bankruptcy Code and describing pre-Code practice).  On the petition date, Southeast was, and has since remained, insolvent.

bankruptcy petition—at least not from an insolvent debtor.  See 11 U.S.C. § 502(b)(2) (instructing courts to determine the amount of a creditor's claim on the date of the petition and disallowing claims for "unmatured interest"); United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 372-73, 108 S. Ct. 626, 631, 98 L. Ed. 2d 740 (1988) (citing section 506(b) for the general proposition that an undersecured creditor will not receive post-petition interest from the debtor); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 163, 67 S. Ct. 237, 240, 91 L. Ed. 162 (1946) ("The general rule in [pre-Code] bankruptcy . . . has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings.").  The rule takes account of the fact that the debtor's delay in repayment after the petition date results by operation of law and prevents creditors from profiting or suffering a loss in relation to each other because of the delay.  See Vanston, 329 U.S. at 163-64, 67 S. Ct. at 240.

In a number of cases, senior creditors sought to avoid this result and recover post-petition interest—not from the debtor, but from the distributions made to junior creditors subject to subordination agreements.  Citing the junior creditors' agreement to subordinate their right to repayment until the senior debt had been paid in full, senior creditors argued that even though bankruptcy law prevented their recovery of post-petition interest from the debtor, their loans had not been paid in full, and, therefore, that they could demand payment from whatever distribution the junior creditors received from the debtor.  In 1974, before Congress adopted the Bankruptcy Code, the Court of Appeals for the Third Circuit addressed this argument and concluded that a junior creditor could agree to subordinate its claim to a senior creditor's demands for post-petition interest, if the subordination agreement *explicitly* provided for such a result:

> If a creditor desires to establish a right to post-petition interest and a concomitant reduction in the dividends due to subordinated creditors, the agreement should

16

clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-a-vis these parties.

In re Time Sales Fin. Corp., 491 F.2d 841, 844 (3d Cir. 1974).

Significantly, however, the Time Sales court held that general language in the subordination agreement, establishing that the senior debt must be "paid in full" before payment on the junior debt, was insufficient to alert the junior creditor that it had agreed to subordinate its claims to the senior creditor's claims for post-petition interest. Id. at 842, 844. Specifically, the Third Circuit held that the district court had not abused its discretion by exercising its equitable power to find that the subordination agreement was insufficiently explicit to permit the senior creditor's claim for post-petition interest. Id. at 844. A number of courts, when confronted with similar claims and subordination agreements, adopted the Third Circuit's approach and dubbed it the "Rule of Explicitness." See In re King Resources Co., 385 F. Supp. 1269 (D. Co. 1974), aff'd 528 F.2d 789 (10th Cir. 1976); In

re Kingsboro Mortgage Corp., 379 F. Supp. 227, 231 (S.D.N.Y. 1974) (coining the rule of explicitness moniker), aff'd 514 F.2d 400 (2d Cir. 1975) (per curiam).

Chase and Gabriel, as the Senior Creditors, have advanced precisely the same argument in its quest to recover post-petition interest from the Junior Creditors in this case. We have not had occasion, either before or since Congress passed the 1978 Bankruptcy Code, to consider the argument and, therefore, we have never decided whether to adopt the Rule of Explicitness in this circuit. Although Chase argues to the contrary, we find it beyond question that the subordination language in the indenture agreements in this case, which requires "payment in full" without any specific reference to post-petition interest, is insufficiently "precise, explicit and unambiguous" on the topic of post-petition interest to satisfy the Rule of Explicitness. Kingsboro, 379 F. Supp. at 231; see also Time Sales, 491 at 842, 844 ("paid in full" insufficiently explicit to alert the junior creditors); King Resources,

18

528 F.2d at 791-92 (same); <u>Kingsboro</u>, 514 F.2d at 401 (same);

<u>accord</u> <u>First Fidelity Bank, Nat'l Ass'n v. Midlantic Nat'l Bank (In re</u>

<u>Ionosphere Clubs, Inc.)</u>, 134 B.R. 528, 535 n.14 (Bankr. S.D.N.Y.

1991) (providing an example of much more specific subordination

language that would satisfy the rule).  If the Rule of Explicitness

applies, therefore, Chase's claims for post-petition interest arising

out of the subordination agreements must fail.

## II.    The Impact of Section 510(a)

As part of its comprehensive 1978 revision of the bankruptcy

laws, Congress enacted a Code provision that provides for the

legal enforcement of subordination agreements in bankruptcy

courts:

> A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

11 U.S.C. § 510(a).  Chase argues that the language of this provision contradicts the Rule of Explicitness and that section 510(a), therefore, overrules pre-Code practice.  Chase contends that section 510(a) requires courts to enforce subordination agreements according to their terms without indulging the equitable considerations present in much of the pre-Code case law.  Furthermore, Chase argues that, because the statutory language is plain and unambiguous, the legislative history of the section (particularly the fact that it contains no mention of an intent to depart from prior practice by overruling the Rule of Explicitness) is irrelevant to our inquiry.  The Junior Creditors, on the other hand,  argue that the Rule of Explicitness has survived the 1978 revision of the bankruptcy laws because Congress has evidenced no intent to depart from it.

We begin our analysis of this problem by examining the language of the statute itself, which we presume to be conclusive. We will not stray from that principle of construction unless the

literal application of the statute would "'produce a result demonstrably at odds with the intentions of its drafters.'" <u>Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus.)</u>, 19 F.3d 1371, 1375 (11th Cir. 1994) (<u>quoting</u> <u>Ron Pair Enters.</u>, 489 U.S. at 242, 109 S. Ct. at 1031).

The language of section 510(a) provides no such challenge; it directs courts to enforce subordination agreements to the extent that the agreements are enforceable under "applicable nonbankruptcy law." 11 U.S.C. § 510(a). In another context, the Supreme Court has held that Congress's use of the phrase "applicable nonbankruptcy law" in the Bankruptcy Code refers to any <u>relevant</u> federal or state law. <u>See</u> <u>Patterson v. Shumate</u>, 504 U.S. 753, 757-759, 112 S. Ct. 2242, 2246-47, 119 L. Ed. 2d 519 (1992) (noting that nonbankruptcy law is broader than state law, a term Congress also used in the Bankruptcy Code). Unlike the <u>Patterson</u> case, which involved a relevant provision of federal legislation, however, the parties before us have identified no

independent federal statute that might guide the interpretation of subordination agreements; nor have they argued that federal common law should govern the outcome of this case.[8]  This absence of relevant federal authority should not be surprising because the enforcement and "interpretation of private contracts is ordinarily a question of state law." <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 60 n.4, 115 S. Ct. 1212, 1217 n.4, 131 L. Ed. 2d 76 (1995) (quoting <u>Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 474, 109 S. Ct. 1248, 1253, 103 L. Ed. 2d 488 (1989)); <u>see also</u> <u>Butner v. United States</u>, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result,

---

[8]  Although a number of courts have read <u>Patterson's</u> declaration that "applicable nonbankruptcy law" includes federal law to refer to relevant federal common law as well as statutes, <u>see e.g.</u>, <u>Resolution Trust Corp. v. Gibson</u>, 829 F. Supp. 1110, 1117-19 (W.D. Mo. 1993), a "federal common law of contracts is justified only when required by a distinctive national policy," <u>Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.</u>, 661 F.2d 479, 483 n.2 (5th Cir. Unit B 1981) (quoting <u>Bartsch v. Metro-Goldwyn-Mayer, Inc.</u>, 391 F.2d 150, 153 (2d Cir. 1968) (internal quotation marks omitted)).  The interpretation and enforcement of a contract between private parties presents no such distinctive federal interest.

22

there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

The subordination agreements in this case each contain a choice of law clause that provides that New York law governs the enforcement and interpretation of the contracts. The *relevant* nonbankruptcy law for the enforcement of subordination agreements in this case, therefore, appears to be New York law. See e.g., Plastino v. Eureka Fed. Sav. and Loan Ass'n (In re Sunset Bay Assocs.), 944 F.2d 1503, 1508 (9th Cir. 1991) (applying California law to interpret a subordination agreement as the applicable nonbankruptcy law pursuant to section 510(a)); In re Best Prods. Co., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (applying New York law pursuant to section 510(a) and a choice of law provision in the subordination agreement); In re Envirodyne Indus. Inc., 161 B.R. 440, 445 (Bankr. N.D. Ill. 1993) (citing

23

section 510(a) and construing a provision in a subordination contract under New York law), aff'd 29 F.3d 301 (7th Cir. 1994 ).[9]

The Junior Creditors argue that section 510(a) and its direction to enforce subordination agreements according to nonbankruptcy law is irrelevant to this dispute because the Rule of Explicitness is a rule of contract interpretation—not enforcement. Regardless of whether we characterize the Rule of Explicitness as interpretation or enforcement, however, section 510(a)'s instruction to enforce subordination agreements on par with other contracts under nonbankruptcy law constitutes a plain departure from the prior practice of enforcing and interpreting those agreements pursuant to the bankruptcy courts' equitable powers. Although the Junior Creditors have argued to the

---

[9] Section 510(a)'s instruction to enforce subordination agreements is roughly analogous to section 2 of the Federal Arbitration Act, which makes agreements to arbitrate "enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In this context, the Supreme Court has explained that, although federal law establishes the enforceability of arbitration agreements, a court must construe that agreement according to generally applicable principles of state law. See Perry v. Thomas, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 2527 n.9, 96 L. Ed. 2d 426 (1987); see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995) (applying "ordinary state-law principles that govern the formation of contracts" in interpreting an arbitration agreement).

contrary, the Rule of Explicitness developed as a tool for the exercise of those equitable powers. See e.g., Time Sales, 491 F.2d at 844 & n.10 (holding that the district court had not abused its discretion in the exercise of its equitable powers). Section 510(a)'s instruction to enforce subordination agreements according to nonbankruptcy law, therefore, appears to cut away the equitable mantle under which the bankruptcy courts fashioned the Rule of Explicitness.[10]

Indeed, under prior bankruptcy law, the bankruptcy courts enjoyed extensive equitable powers and exercised those powers

---

[10] Regardless of whether the Rule of Explicitness was a creation of law or equity, the source of the rule was undeniably federal and not state law. Our conclusion that Congress, by designating state law as the appropriate vehicle by which to enforce subordination contracts, removed the rule's authoritative foundation, therefore, applies regardless of whether pre-Code practice depended upon equity or federal law.

We note that one of the major treatises on bankruptcy law disagrees with our reading of Time Sales and its progeny on this point; it assumes that those cases rely on state law. See 4 Marcia L. Goldstein et al., Collier on Bankruptcy ¶ 510.03[3] at 510-8 & n.11 (Lawrence P. King ed., 15th ed. rev., Matthew Bender 1998). Our own reading of the cases, which contain no reference to state authority, however, is sharply at odds with the treatise on this point. Nevertheless, regardless of our academic disagreement with the treatise over the rule's pedigree, the treatise's view of the Rule of Explicitness is consistent with our ultimate conclusion that the rule must now find its source of authority in state, not federal, law or equity.

broadly.[11]  The Supreme Court, however, has read the 1978

Bankruptcy Code to curtail those powers in significant ways and

has explained that "whatever equitable powers remain in the

bankruptcy courts must and can only be exercised within the

confines of the Bankruptcy Code."  Norwest Bank Worthington, v.

Ahlers, 485 U.S. 197, 206, 108 S. Ct. 963, 969, 99 L. Ed. 2d 169

(1988).[12]        In certain contexts, the Code includes express

provisions for the continued exercise of equitable power in the

bankruptcy courts.  On the topic of subordination, for example,

section 510(c) authorizes the bankruptcy courts to continue the

---

[11]  As one commentator has explained:
Under the Bankruptcy Act, courts used their equitable powers quite broadly.  This tradition of equitable interpretation of the Act grew out of bankruptcy judges' efforts to address many important issues the Act left unresolved . . . and out of their attempts to make the bankruptcy laws function in spite of Congress' failure to update the Act . . . .
Adam J. Wiensch, Note, The Supreme Court, Textualism, and the Treatment of Pre-Bankruptcy Code Law, 79 Geo. L.J. 1831, 1860 (1991).

[12]  See generally, Wiensch, The Supreme Court, 79 Geo. L. J. at 1860-61 (explaining that the lack of uniform results, attributable to the bankruptcy courts' exercise of their equitable powers under the Bankruptcy Act, was a driving force behind the enaction of the Bankruptcy Code, and that the Supreme Court has taken a much narrower view of the bankruptcy courts' powers to do equity under the Code).

practice of equitable subordination.[13]  The language of section

510(c) expressly invokes the bankruptcy courts' historical exercise

of their equitable powers to subordinate the claims of creditors

who engaged in inequitable conduct in favor of the claims of those

creditors who came to court with clean hands.[14]  Section 510(c),

therefore, powerfully demonstrates that Congress was aware of

the bankruptcy courts' exercise of their equitable powers in the

context of subordination, and that Congress knew how to

---

[13]  Section 510(c) provides:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
> (1) under the principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> (2) order that any lien securing such a subordinated claim be transferred to the estate.
11 U.S.C. § 510(c) (emphasis added).

[14]  The legislative statement accompanying section 510(c) states in pertinent part:
> It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts development of this principle.  To date, under existing law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor.
11 U.S.C. § 510 Legislative Statement; see also H.R. Rep. 95-595 at 359, reprinted in 1978 U.S.C.A.A.N. 5963, 6315 (noting the legislative intent to codify prior case law concerning the courts' power of equitable subordination and explaining that this Code provision "is not intended to limit the court's power in any way.  The bankruptcy court will remain a court of equity . . . .")

preserve those powers to the extent it chose to do so.  In sharp contrast to section 510(c), however, section 510(a) includes no such express grant of authority that would permit the bankruptcy courts to continue enforcing and interpreting subordination agreements in equity.  When compared with Congress's decision to permit the bankruptcy courts to retain their powers of equitable subordination in section 510(c), section 510(a)'s command to enforce subordination agreements according to the applicable nonbankruptcy law can only be read as a clear and contemplated break with prior practice.[15]  Accordingly, the plain language of the text, as well as the provision's structure, supports our conclusion that Congress, by designating state law to govern the interpretation and enforcement of subordination agreements,

---

[15] Congress's decision to permit the bankruptcy courts to exercise their equitable powers in the context of equitable subordination could be read with a view toward the classic maxim of statutory construction: *expressio unius est exclusio alterius*.  See Black's Law Dictionary 581 (6th ed. 1990) ("the expression of one thing is the exclusion of another.").  In the context of section 510, however, Congress has gone further than simply expressing one  command in section 510(c) and making another by silent implication.  Section 510(a) directly instructs courts to enforce subordination contracts according to the relevant (in this case, New York) law rather than equity.

withdrew the foundation of equitable authority under which the bankruptcy courts had developed the Rule of Explicitness.

Finally, the Junior Creditors argue that Congress could not have intended such a radical departure from pre-Code practice because the Bankruptcy Code's legislative history is devoid of any reference to the Rule of Explicitness and indicates no intent to change the law as it had developed on this point. As Judge Fay's dissent points out, the Junior Creditors' analytical approach receives considerable support in the Supreme Court's cases, which observe that Congress generally did not depart from well-developed pre-Code practice without making its intent to do so clear either in the text of the new Code or by discussing the point in the legislative history. See e.g., Dewsnup v. Timm, 502 U.S. 410, 419, 112 S. Ct. 773, 779, 116 L. Ed. 2d (1992) ("[T]his Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not

the subject of at least some discussion in the legislative

history.").[16]  The applicable legislative history reflects that

Congress was aware of then current practice with regard to the

enforcement of subordination provisions, see H. R. Rep. No. 95-

595 at 396, reprinted in 1978 U.S.C.C.A.N. 5963, 6352,[17] but the

parties agree that the legislative history does not mention the Rule

of Explicitness nor does it speak to the issues before us.

Although both the Code and the legislative history are silent on

these particular topics, we find section 510(a)'s command to

---

[16]  As a dissenter noted in Dewsnup, the Court's emphasis on silence in the legislative history in that case appeared to be at odds with the Court's prior efforts to interpret the Bankruptcy Code.  Dewsnup, 502 U.S. at 435, 112 S. Ct. at 787 (Scalia J., dissenting) ("I have the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case.")(citing Wolas, 502 U.S. 151, 112 S. Ct. 527 and Ron Pair Enters., 489 U.S. 235, 109 S. Ct. 1026).

[17]  The parties vigorously disagree over whether we may presume that Congress was even aware of prior practice under the Rule of Explicitness.  The only honest answer to that question, of course, is that we cannot know what (if anything) Congress thought about these issues when it passed section 510(a) of the Bankruptcy Code.  We note, however, that a rule adopted by three of the federal circuits and adhered to without exception appears to be at least as well recognized as prior practices that the Supreme Court has held to be within Congress's presumptive cognizance.  See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 500-01, 106 S. Ct. 755, 759, 88 L. Ed. 2d 859 (1986) (describing three cases as sufficient evidence of "well-recognized" restrictions on a trustee's abandonment powers).  But see Ron Pair Enters., 489 U.S. at 248, 109 S. Ct. at 1034 ("[T]here is no reason to think that Congress, in enacting a contrary standard, would have felt the need expressly to repudiate [a doctrine that guided the bankruptcy courts in the exercise of their equitable powers].")

enforce subordination agreements on par with other contracts under the applicable nonbankruptcy law a sufficient indication that Congress intended to depart from the previous regime of enforcing and construing these private contracts in federal equity. As even the Dewsnup court observed, "where the language [of the Code] is unambiguous, silence in the legislative history cannot be controlling." Dewsnup, 502 U.S. at 419-20, 112 S. Ct. at 779. Section 510(a) is not ambiguous in requiring that subordination agreements be enforced the same as nonbankruptcy agreements. By requiring post-petition interest provisions to be more explicit than other nonbankruptcy provisions, the rule of explicitness is contrary to section 510(a). Accordingly, we conclude that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code rule of explicitness. As a necessary consequence of this change in bankruptcy law, the Rule of Explicitness can no longer survive as the progeny of the

bankruptcy courts' equity powers or as a federal canon of contract construction.[18]

III.  **Enforcement and Interpretation of the Subordination Agreements Pursuant to New York Law**

We now turn to New York law to determine whether the subordination agreements before us require the holders of the Subordinated Notes to subordinate their claims to Chase and Gabriel's demand for post-petition interest. We note, however, that since claims for post-petition interest arise almost exclusively in bankruptcy proceedings, the New York courts previously have not had occasion to consider what language in a subordination agreement would be sufficient to require a junior creditor to bear the risk and burden of paying post-petition interest to the senior creditor out of the junior creditor's distributions under the

---

[18]  The only other court to consider this question after Congress passed section 510(a) of the Bankruptcy Code assumed the continued validity of the Rule of Explicitness. See In re Ionosphere, 134 B.R. at 533-34. Although we find such a conclusion untenable for the reasons stated above, we note that the parties in that case appear not to have disputed the issue and the bankruptcy court, while noting its doubts, see id. at 534 n.11, appeared reluctant to contradict otherwise settled precedent in the Second Circuit.

Bankruptcy Code. The parties have cited a good deal of New York case law that stands for the uncontroversial and irrelevant propositions that New York enforces contracts as written, that a senior creditor is entitled to priority to the extent contracted for, and that a senior creditor cannot rely on a legally unenforceable obligation to subordinate a junior creditor's claim. These authorities provide us with little guidance as to how a New York court might interpret the language at issue in these subordination agreements.

We note that although the "paid in full" language present in the subordination agreements sounds in absolute terms, in the context of bankruptcy proceedings (which the parties to a subordination agreement obviously contemplate to some extent), the phrase is ambiguous. In one sense, Chase's characterization of the phrase as requiring the payment of interest until the final repayment of the underlying obligation is a straightforward one. See e.g., Richardson v. Providence Washington Ins. Co., 237

N.Y.S.2d 893, 905-06 (N.Y. Sup. Ct. 1963) (payment in full requires interest until the date of settlement).  In the bankruptcy context, however, the law has long been clear that even a senior creditor often has no claim for post-petition interest from the debtor and, therefore, a junior creditor may reasonably expect to recover some repayment from the debtor without being held hostage to an often sizable claim for the senior creditor's post-petition interest.  See e.g., In re Ionosphere, 134 B.R. at 535 (discussing this ambiguity while construing a contract governed by New York law).

Moreover, we wonder whether the New York courts would disturb the heretofore uniform treatment of this question, particularly given the evidence that the capital markets appear to have adjusted to the Rule of Explicitness.  The American Bar Association's model forms, for example, now include a "Model Simplified Indenture" that includes subordination language that specifically and unmistakably alerts the junior creditor to its liability

for the senior creditor's post-petition interest.  <u>See</u> American Bar Association, <u>Model Simplified Indenture</u>, 38 Bus. Law. 741, 769 (1983); <u>see also</u> <u>In re Ionosphere</u>, 134 B.R. at 535 n.14 (quoting an indenture with similarly explicit language).  Similarly, one of the most authoritative bankruptcy treatises warns that an indenture agreement must include explicit and specific language to put the junior creditor on notice regarding post-petition interest in deference to the Rule of Explicitness.  <u>See</u> <u>Collier on Bankruptcy</u> ¶ 510.03[3].  Given New York's role as the nation's financial capital and our intuition that a sizeable proportion of outstanding indenture agreements include clauses that invoke New York law, as well as the importance of standardization in indenture agreements generally, we suspect that the courts of New York, as a practical matter, would be loath to depart from prior practice and thus radically reduce the current value of debt held subject to the condition of subordination until the senior creditor receives

"payment in full."[19]  See generally, Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048 (2d Cir. 1982) ("[U]niformity in interpretation is important to the efficiency of capital markets. . . .  Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 943 (5th Cir. Apr. 1981) (en banc) (construing an indenture agreement governed by New York law and noting that "[a] large degree of uniformity in the language of debenture indentures is essential to the functioning of the financial markets . . . ."); accord Leverso v. Southtrust Bank of Al., N.A., 18 F.3d 1527, 1534 (11th Cir. 1994) (same).

---

[19]  Or, conversely, dramatically increase the current value of senior-debt held subject to a condition that all junior-claims are subordinate to the senior creditor's right to be paid in full.

Nevertheless, since this is an important question of first impression for the New York courts, and one that Congress has specifically directed to state law, we are reluctant to predict its resolution under New York law. Accordingly, we have decided to certify the following question to the New York Court of Appeals pursuant to N.Y. Rules of Court § 500.17(a):[20]

What, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?

Since the remaining questions, whether Chase may recover reasonable costs and fees for prosecuting this action and whether recent changes in New York law regarding the enforcability of contracts for compound interest permit Chase to collect interest upon interest pursuant to section 5.2 of the Senior Indenture,

[20] Section 500.17 provides:
(a) Whenever it appears to the Supreme Court of the United States, any United States Court of Appeals, or a court of last resort of any other state that determinative questions of New York law are involved in a cause pending before it for which there is no controlling precedent of the Court of Appeals, such court may certify the dispositive questions of law to the Court of Appeals.
N.Y. R. App. Ct. § 500.17(a) (McKinney 1997).

necessarily depend upon whether Chase and Gabriel are entitled to post-petition interest at all, we defer our decision on these matters until the New York Court of Appeals has had an opportunity to consider the question.

## CONCLUSION

Chase and Gabriel sought to collect post-petition interest, interest upon that interest, as well as post-petition fees and costs, from the Junior Creditors by arguing that section 510(a) of the Bankruptcy Code had abrogated the judicially created "Rule of Explicitness." We concluded that section 510(a)'s direction to enforce subordination agreements according to applicable nonbankruptcy law required us to enforce and interpret the subordination clause in the Subordinated Indentures under New York law. Since our review of New York law revealed no intimation of what specific language (if any) the New York courts would require to put a junior creditor on notice regarding the

38

significant risk of subordinating a debt to a senior creditors claims for post-petition interest and post-petition fees and costs, we CERTIFIED this important question to the New York Court of Appeals. Accordingly, it is hereby ORDERED that the Clerk of the United States Court of Appeals for the Eleventh Circuit transmit to the Clerk of the New York Court of Appeals a Certificate, in the form set forth above, together with a complete set of briefs, appendices, and record filed by the parties with this Court. This panel retains jurisdiction so that, after we receive a response from the New York Court of Appeals, we may dispose of the appeal. The parties are hereby ordered to bear equally such fees and costs, if any, as may be requested by the New York Court of Appeals.

REVERSED in part and question CERTIFIED to the New York Court of Appeals.


FAY, Senior Circuit Judge, dissenting:

Most respectfully, I dissent. The majority opinion abolishes the well established Rule of Explicitness in bankruptcy proceedings. It does so by relying on "silence" in the legislative history of the 1978 Bankruptcy Code and by a strained interpretation of the language of 11 U.S.C. § 510(a). In my opinion this is both unfounded and unwise.

As the majority correctly points out, the examination of the statue begins with the language itself. However, it is also true that when Congress amends the bankruptcy laws, it does not "write on a clean slate," but rather, is guided by the established practices of the bankruptcy courts. Dewsnup v. Timm, 502 U.S. 410, 419, 112 S. Ct. 773, 779, 116 L. Ed. 2d 903 (1992). Further, as the majority observes, we must assume that Congress was fully aware of the Rule of Explicitness when enacting § 510(a). See Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection, 474 U.S. 494, 500-501, 106 S. Ct. 755, 759, 88 L. Ed. 2d 859 (1986); In re Charter Co., 876 F.2d 866, 870 n.6 (11th Cir.

1989), cert. dismissed, 496 U.S. 944, 110 S. Ct. 3232, 110 L. Ed. 2d 678 (1990).

The Supreme Court has provided a guideline for interpreting this section by holding that amendments to existing bankruptcy laws are not to be read to revoke judicially established principles absent an express statement or a clear indication that such a result was intended. Cohen v. De La Cruz, 118 S. Ct. 1212, 1218, 140 L. Ed. 2d 341 (1998); Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 522, 563, 110 S. Ct. 2126, 2133, 109 L. Ed. 2d 588 (1990); Midlantic Nat'l Bank 474 U.S. at 501 ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 813, 109 S. Ct. 1500, 1506, 74 L. Ed. 2d 562 (1983). We have repeated this standard in In re Colortex Industries, Inc., 19 F.3d 1371, 1374 (11th Cir. 1994)

41

("Silent abrogation of judicially created concepts is particularly disfavored when construing the Bankruptcy Code.").

The section which the appellant contends overrules the Rule of Explicitness states:

> A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

11 U.S.C. § 510(a).

There is simply nothing in the language of this section declaring the Rule of Explicitness abolished. The statute is completely silent. Furthermore, the legislative history provides no indication that the intention of § 510(a) was to eliminate the Rule of Explicitness. To display such an intention, one would expect at least a marginal amount of debate on the rule. To the contrary, the Rule of Explicitness was never mentioned in the legislative history. See H.R. REP. No. 595, 95th Cong., 1st Sess. 359 (1977), reprinted in 1978 U.S.C.C.A.N. 5963; S. REP. No. 989, 95th Cong., 2d Sess. 74 (1978), reprinted in 1978 U.S.C.C.A.N. 5787.

Moreover, the policy of denying claims for postpetition interest to creditors has long been established. This general rule was promulgated by the English bankruptcy system nearly two centuries ago and was subsequently adopted by our legal system. See Sexton v. Dreyfus, 219 U.S. 339, 344, 31 S.C.t. 256, 257, 55 L.Ed. 244 (1911). Ultimately, Congress codified this policy in the Bankruptcy Code under 11 U.S.C. §§ 502 and 506. Section 502(b)(2) states the general rule that a claim for interest is suspended once the petition for bankruptcy is filed. See 11 U.S.C. 502(b)(2). Section 506 carves out a narrow exception to the general rule by allowing claims for postpetition interest for oversecured creditors. 11 U.S.C. 506(b). Although §§ 502 and 506 concern postpetition interest claims against the estate and not between creditors, the Rule of Explicitness works in harmony with those sections by disallowing claims for postpetition interest between creditors unless the agreement is unequivocal. In light of those sections, one would expect that if Congress intended to eliminate the Rule of Explicitness they would have made that intention unmistakably clear. I do not think it is correct to find a clear intention to abandon an established rule of bankruptcy law through the silence of Congress. In short, it is my opinion that Congress did not intend to abrogate the Rule of Explicitness.

The holding of the majority also runs counter to a number of respected commentaries, written after Congress amended § 510(a), which cite the Rule of Explicitness as a governing principle when considering the award of postpetition interest. See Jonathon M. Landers, Kathryn A. Coleman, Claims Issues, 767 PLI/Comm 819, 846 (1998) ("Several decisions hold that, given the general bankruptcy rule against post-petition interest, the subordination will not enable senior lenders to

43

obtain post-petition interest at the expense of junior lenders unless the indenture specifically so provides."); Marcia L Goldstein, Sean L. McKenna <u>Intercreditor and Subordination Issues</u>, 793 PLI/Corp 679, 684 (1992) ("subordination to postpetition interest must be carefully crafted in order to be enforceable in a bankruptcy case."); Carl D. Lobell, Sharon B. Applegate, <u>Lending to Troubled Companies - Special Considerations: Fraudulent Transfers, Substantive Consolidation, Subordinated Debt Treatment; Developing Theories of Lender Liability and Equitable Subordination</u>, 733 PLI/Corp 175, 253 (1991); Margaret Sheneman, <u>Classification and Allowance of Claims</u>, 429 PLI/Comm 931, 974 (1987).  <u>See also</u> <u>In re Southeast Banking Corp.</u>, 212 B.R. 682, 688 (S.D. Fla. 1997) (citing other articles).  The position of the majority is also refuted by the leading treatise in the area which cites the Rule of Explicitness to limit recovery of postpetition interest.[21]  4 L. King <u>Collier on Bankruptcy</u> ¶ 510.03[3] at 510-8 (15th ed. rev. 1998).  The commentaries and the rulings being reviewed convince me that the language of § 510(a) has not abolished the Rule of Explicitness.

The Rule of Explicitness was created more than twenty years ago by the bankruptcy courts based on equitable considerations.  It was upheld as good law by

---

[21]<u>Collier</u> states, "[c]ourts have uniformly relied on state law to prevent . . . [senior creditors from recovering from junior creditors], invoking the rule of contract construction know as the Rule of Explicitness to deny postpetition interest to undersecured senior creditors even in the face of valid and enforceable subordination agreements."  4 L. King <u>Collier on Bankruptcy</u> ¶ 510.03[3] at 510-8 (15th ed. rev. 1998).  In fairness, it is important to note the decision of the Bankruptcy Court in this case was one of several cases cited to support this position.  Nonetheless, the possibility of an inconsistency with the Rule of Explicitness and § 510(a) is not mentioned.

three different appellate courts[22], is of sound policy, and completely consistent with the goals of bankruptcy law. It is well known and accepted by those in the financial world. I do not believe the rules of statutory interpretation set forth by the United States Supreme Court allow us to void such a rule without a more definite mandate from Congress. I would affirm the opinion of the District Court, which affirms the ruling of the Bankruptcy Court, for the reasons set forth in the opinions of those courts.[23]

---

[22]In re Matter of King Resources Co., 528 F.2d 789 (10th Cir. 1976); In re Kingsboro Mortgage Co., 514 F.2d 400 (1975); In re Time Sales Fin. Corp., 491 F.2d 841 (3rd Cir. 1974).

[23]In re Southeast Banking Corp., 212 B.R. 682 (S.D. Fla. 1997); In re Southeast Banking Corp., 188 B.R. 452 (Bankr. S.D. Fla. 1995).