**In re Jack Kenneth VICK, Jr., Debtor.**

**No. 6:03–BK–07896–KSJ.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

July 15, 2005.

Arlys L. Buschner, Orlando, FL, for debtor.

### MEMORANDUM OPINION DENYING CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN AND SUSTAINING DEBTOR'S OBJECTION TO CLAIM 5 FILED BY LINDA VICK

KAREN S. JENNEMANN, Bankruptcy Judge.

Jack Vick, Jr., the debtor in this Chapter 13 case, and Linda Vick were married in 1984. After nine years of marriage, Linda filed for divorce in the Florida state courts. Eleven years later, the spouses are still litigating the terms of the divorce.

The current dispute now has flowed into the bankruptcy court where Jack has proposed a Chapter 13 plan that would pay 10 percent to his unsecured creditors, who are composed almost entirely of divorce-related obligations. The primary issue before the Court is whether the small return to these creditors demonstrates a good faith intent on Jack's part to rehabilitate his debts and financial situation, or, instead, is just a further avoidance of his obligation to repay these creditors, primarily his former wife. For the reasons discussed below, the Court finds that the Chapter 13 plan was not filed in good faith and is not confirmable.

In addition, Linda Vick has filed a proof of claim, Claim 5, seeking a total amount of $167,397.64. Because Ms. Vick obviously is seeking much more than she is entitled to receive under the various orders entered in her divorce case, the debtor has filed an Objection to Claim 5 (the "Objection") (Doc. No. 84). The Court agrees that Claim 5 is unjustifiably inflated and, for the reasons stated below, will sustain the Objection.

Jack and Linda Vick were married on September 23, 1984. They have one daughter, who recently turned seventeen. During the early years of their marriage, Jack and Linda lived in Atlanta, Georgia. Jack worked as an Executive Vice President with a banking consultant firm. They lead a privileged lifestyle with new cars, a large house, and excess disposable income. Jack alone earned over $100,000.[1]

By 1993, Jack and Linda had moved to Florida so that Jack could assume control of his father's business, Parker Glass Company, a prosperous company that sold and installed glass on both commercial and residential projects. The intent of the couple

---

1. The Fifth District Court of Appeals of the State of Florida has found in one of their appellate orders that "the parties [Jack and Linda] were employed in the banking industry, each earning approximately $100,000 per year. They were living in Atlanta and led a very comfortable lifestyle which included a Porsche and plans to build a 4,500 square-foot dream home." Order on Motion for Clarification and/or Rehearing, p. 2. (Linda's Ex. No. 48.)

was that Jack would learn the trade and then gain ownership of the company.[2] Before realizing this dream, the couple separated in April 1993.

The divorce, filed by Linda in 1994, was acrimonious from the beginning. Many issues were raised, contested, and decided. One of the central issues was the valuation and ownership of Jack's stock interest in Parker Glass Company. Although a Final Judgment of Dissolution of Marriage was entered on May 16, 1994 (Linda's Ex. No. 48), the fight had only just begun. The parties filed appeals, writs, and numerous motions. Indeed, the single spaced docket at just the trial court level, printed in November 2004, is 30 pages long. (Linda's Ex. No. 87.) The litigation has continued for eleven years.

Eventually, on March 18, 1998, after a second trial and multiple evidentiary hearings on various issues remanded by the appellate court, the Florida state trial court held that Linda was entitled to receive $60,000 attributable to the enhanced value of the parties' stock in Parker Glass Company. (Linda's Ex. No. 48.) In making this ruling, the Florida trial court opined that "[t]he Former Husband [Jack] and his representatives have been somewhat recalcitrant and evasive in disclosing the true nature of his business and its assets and his true income and that increased the expenses of the litigation. The court also finds that a bit of litigation and motions have been used primarily to harass the Former Wife [Linda]." (Supplemental Order—Trial on Remand Resulting from Status Hearing of June 12, 1997, entered on March 18, 1998, Linda's

Ex. No. 48, p. 3, ¶ 9.) The court continued to find that:

[t]he Former Husband's claims of zero assets and inability to pay the ordered amounts are unbelievable based on the evidence presented in this case, in that the Former Husband is almost half owner in a business that generates $1.2 million per year, and that he and his partner have control of their income, including the payment of bonuses that exceed $100,000 per year, are driving brand new cars, and taking money 'under the table.' The Former Husband is enjoying and will enjoy the capacity for greater bonuses, and has demonstrated that his father is out of the picture and the Former Husband seems to be enjoying bonuses at will.

*Id.*, at p. 4, ¶ 10. In conclusion, the state court gave Jack an extension, until June 12, 1998, to pay Linda $60,000 without penalty or interest. If the award was not paid in full by June 12, 1998, interest at the rate of 10 percent a year would accrue from the date the payment was ordered, June 12, 1997.

When Jack continued to refuse to pay amounts due to Linda, further contempt hearings were held before the state court on October 20, 1999. At the end of the hearing, the state court judge, the Honorable Robert M. Evans, found Jack in contempt and directed him to be jailed until he paid $7,600. (Linda's Ex. No. 72.) In refusing to grant any leniency on the incarceration, Judge Evans, in obvious frustration, told Jack:

Sir, ...my experience has been you have delayed, you have obfuscated, you have gone out of your way to make this

---

**2.** The Fifth District Court of Appeals for the State of Florida in its Order on Motion for Clarification and/or Rehearing, entered on June 28, 1996, found that Jack "was formally given 25% of the stock of Parker Glass" in 1991. (Linda's Ex. No. 48, p. 2.) The stock was determined to be a non-marital asset. In the divorce, Linda was awarded the value the stock increased during the parties' marriage.

process as difficult as is humanly possible. You have—made this case far more complicated than it needs to be and because of that, you have created huge amounts of expenses and you're going to be made to pay for them, or you're going to go to jail.

*Id.,* p. 44–45. Eventually, when Jack made no payments as ordered, other than the $7,600 to obtain his release from jail, the state court entered, on March 14, 2003, a Final Judgment against Jack in the principal sum of $107,812 (the "Divorce Award"). (Linda's Ex. No. 48.)

Approximately four months later, on July 9, 2003, Jack filed this case, initially as a Chapter 7 liquidation case. Marie Henkel was appointed as his Chapter 7 trustee. The litigation in Jack's Chapter 7 case started almost immediately. Linda filed Adversary Proceeding No. 03–312 objecting both to Jack's discharge and to the dischargeability of the Divorce Award.[3]

In addition, Ms. Henkel, as Jack's Chapter 7 trustee, filed Adversary Proceeding No. 03–313 against Jack's father, Jack Vick, Sr. In the debtor's Statement of Financial Affairs (Doc. No. 1), in response to Question No. 18, Jack stated that, around October 20, 1999, he "sold" 250 shares he previously held in Parker Glass Company to his father.[4] Because this transfer for questionable consideration to a family member occurred within four years of the bankruptcy filing, the trustee's suit alleged that the stock sale was a fraudulent transfer (Doc. No. 1, Adv.Pro. No. 03–313). In response, Jack Vick, Sr. filed a vague and

ambiguous answer that "[t]he Defendant [Jack Vick, Sr.] possessed and controlled the Parker Glass Company stock as of the date of the stock transfer on October 22, 1999." Because this statement was directly contrary to the position of Jack and his father taken in the state court action, Linda then filed a motion with the state court to reconsider the Divorce Award due to fraud. Essentially, Linda now wants the state court to reconsider the equitable distribution award for her share of the appreciated value of the Parker Glass Company stock. Clearly, neither the divorce action nor the Chapter 7 case with its two filed adversary proceedings were going smoothly for Jack.

So, on May 11, 2004, Jack filed a notice converting his Chapter 7 case to a case under Chapter 13. One advantage of a Chapter 13 case, under the current bankruptcy law, is that a debtor has the ability to repay debts that would otherwise be nondischargeable in a Chapter 7 case, such as property division in a divorce case. The debtor can extend the payments out for as long as five years. A new trustee, Laurie K. Weatherford, was appointed.

■ Within days of converting his case to Chapter 13, Jack received a federal tax refund of approximately $6,800. He failed to turn these funds over to his new Chapter 13 trustee, Ms. Weatherford, for distribution to his creditors. Instead, in June 2004, he used the monies to resurface his pool, at a cost of around $2,500, and used the balance to pay attorney fees to his bankruptcy lawyer and to his lawyer in the

---

**3.** Although the Court never reached the merits of Linda's complaint, the evidence introduced during these later hearings in Jack's Chapter 13 case indicates it was very probable that any debt due to Linda by Jack would be nondischargeable.

**4.** Jack supported this statement with an undated "Agreement to Sell Stock" executed by

he and his father in which Jack agreed to sell Jack Vick, Sr. "250 shares of Parker Glass Company stock effective 10/22/99 for the amount of $7,600 required for my release from jail plus forgiveness of the $65,000 in loans received form [sic] Jack Vick, Sr., during the past two years." (Debtor's Ex. No. 11).

state court divorce action. Jack never sought court approval for these payments, which, at least as to the attorney fees, are clearly improper post-petition transfers.[5] The entire amount of this tax refund properly should have gone to pay Jack's creditors, not to pay his lawyers or resurface his pool. An extra $6,800 would have substantially increased payments to Jack's creditors insofar as Jack listed virtually no assets available for distribution to his creditors (Doc. No. 1).

In his schedules and statement of financial affairs, Jack listed his home, valued at $120,000, as well as miscellaneous personal property, valued at $16,045. However, he contends that of his estimated $16,045 in personal property, he really only possesses $8,545 worth of property because Linda is holding several items including a baby grand piano, silver, crystal, and china, valued at $7,500. Jack claimed both his home and personal property of $1,650 as exempt from the claim of his creditors.

Jack has very few non-divorce related creditors. Chase Mortgage holds a claim of approximately $70,000, which is secured by the debtor's home. Huntington Bank holds a car lease on Jack's Jeep Grand Cherokee, with a balance of $19,646.[6] Jack listed one credit card debt of $7,500, payable to Chase Master Card. He was current on all of these debts on the day he filed his Chapter 7 case. He certainly did not need any relief from this Court to address his routine, consumer debts.

However, Jack also listed various debts due to his father, Jack Vick, Sr., to Linda, and to Linda's attorneys. Jack contends he owes his father $35,000 on a personal loan. Jack's father filed a proof of claim contending he actually was owed $85,102 by his son for "money loaned." (Claim No. 2.) No promissory notes or supporting documentation was attached to this proof of claim. When Linda filed an objection to Jack Vick, Sr.'s claim (Doc. No. 67), he quickly withdrew the claim, rather than demonstrate its validity. Accordingly, Jack owes his father nothing, at least in this Chapter 13 case.

Jack does acknowledge that he owes Linda $107,812 in connection with the Divorce Award and owes her attorneys[7] $20,457.76. Jack does not dispute the amount due to Linda's attorneys, but he has objected to Linda's proof of claim (Doc. No. 84). In Claim 5, Linda seeks a total amount of $167,397.64. Of this amount, $158,397.64 is sought as an unsecured claim related to Linda's entitlement to receive a portion of the enhanced value of the Parker Glass Company. In the Divorce Award, the Florida state court entered a judgment in Linda's favor for the amount of $107,812. (Linda's Ex. No. 48.) Certainly, Jack owes Linda this

---

5. An attorney may not take fees from a chapter 13 debtor post-petition without court approval. *In re Anderson*, 253 B.R. 14, 20 (Bankr.E.D.Mich.2000) (*citing In re Pair*, 77 B.R. 976 (Bankr.N.D.Ga.1987) ("Attorney's collection of post-filing attorney fees, without prior court approval, is in violation of the Bankruptcy Code, Rules and case law."); *In re Courtois*, 222 B.R. 491, 495 (Bankr.D.Md. 1998) ("Court approval is required for postpetition attorney's fees to be paid from estate."); *In re Fricker*, 131 B.R. 932, 941 (Bankr. E.D.Pa.1991)).

6. Although the Jeep Cherokee is used by Jack, Parker Glass Company makes the monthly lease payments. Therefore, Jack need not make any additional payments on this lease obligation. Accordingly, the Court granted Jack's request to allow Parker Glass Company to make these payments outside of his Chapter 13 plan (Doc. Nos. 85 and 115).

7. Linda's attorney changed firms during the course of their representation of her in the divorce. The firms are Chatham, Seland & Lashley and Kuhn, Chatham & Seland, respectively.

amount together with interest at the rate of 10 percent per year from the judgment date, March 14, 2003, through the date Jack filed his Chapter 13 petition, July 19, 2003, a total of 116 days. Applying the per diem rate of $29.54 per day, Jack owes Linda an additional sum of interest in the amount of $3,426.64, for a total liability of $111,238.64, on the date this Chapter 13 case was filed.

■ The difference between the uncontested amount due, $111,238.64, and the amount sought by Linda in her claim, $158,397.64, is attributable to additional interest accruing after the petition date as well as a penalty of 10 percent per year imposed on Jack. Neither of these amounts is allowable. Because this is an unsecured claim, interest does not accrue after the petition date. *In re Loewen Group Intern., Inc.*, 274 B.R. 427, 442–443 (Bankr. D.Del.2002) ("As a general matter, unsecured creditors are not entitled to recover interest that accrues on their claims after the filing of a bankruptcy petition.") (*citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988)); *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1119 (11th Cir.1998); *In re Woodmere Investors, Ltd. P'ship*, 178 B.R. 346, 355 (Bankr.S.D.N.Y.1995); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 164, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946); *Bruning v. United States*, 376 U.S. 358, 363, 84 S.Ct. 906, 908–09, 11 L.Ed.2d 772 (1964). Linda also is not entitled to any additional penalties against Jack. As such, the Court will allow a total amount of $111,238.64 of Claim 5 attributable to the enhanced value of Jack's interest in Parker Glass Company.

■ Linda also asks, in Claim 5, that this Court modify the child support award-ed by the state court to require Jack to pay an additional $9,000. Bankruptcy courts are not substitutes for state domestic courts and have no role in assessing or modifying child support obligations. *In re Price*, 154 B.R. 344, 345 (Bankr.N.D.Fla. 1993) ("State matrimonial courts have jurisdiction to adjudicate personal rights, custodial relationships, and property entitlements of the parties involved in the proceeding without the interference of a bankruptcy court") (*citing Matter of Palmer*, 78 B.R. 402, 405 (Bankr.E.D.N.Y. 1987)); *In re Harrell*, 33 B.R. 989, 994–995 (D.C.Ga.1983) (*citing Simms v. Simms*, 175 U.S. 162, 167, 20 S.Ct. 58, 60, 44 L.Ed. 115 (1899), *Barber v. Barber*, 62 U.S. (21 How.) 582, 584, 16 L.Ed. 226 (1858) ("We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony")).

Moreover, even if this Court by some stretch had any such jurisdiction, Linda has failed to prove any valid basis why Jack should pay any increased child support. Accordingly, the Court will sustain Jack's objection to Linda's Claim 5. The claim is allowed in the amount of $111,238.64 as an unsecured claim. The claim otherwise is disallowed.

■ After these various rulings, Jack has only four remaining creditors:

● The mortgage debt payable to Chase Mortgage which is current, secured by Jack's home, and not subject to modification.

● Three unsecured debts totaling $139,196.64:

 (i) A credit card debt of $7,500 payable to Chase Master Card;

 (ii) The fees of $20,457.76 payable to Linda's attorneys; and

 (iii) The Divorce Award with interest of $111,238.64 payable to Linda.

The divorce-related unsecured debts total $131,696.40 and constitute 95 percent of Jack's total unsecured debts.

Jack claims he has very limited income to pay these debts. After deducting payroll taxes, social security, and insurance premiums, he has a net monthly income of $1,760.15.[8] From this amount, Jack automatically deducts his child support payments of $752.35 per month,[9] resulting in acknowledged take home pay of only $1,007.80.[10] He also lists "under the table" income of $1,000 per month, which he attributes to "bonuses or side jobs."[11] Jack lists no income for his current wife. Therefore, Jack acknowledges total net monthly income of only $2,007.80.

Jack's net monthly income is not enough to pay his recurring monthly expenses. He lists monthly expenses of $2,159.66. As such, by Jack's own admission, he has *no* disposable income to contribute to payments under his Chapter 13 plan.

Yet, Jack's prior earnings reflect a totally different story. In his Statement of Financial Affairs (Doc. No. 1), Jack lists income in 2003 of only $23,735. Yet in 2002, he earned $57,271, and in 2001, he earned $62,274. In 1997, Jack filed an affidavit in the Florida State Court swearing that he was "owner" of Parker Glass Company and, further, that he earned a gross income of $6,225 per month, for a total of almost $74,710 per year. The testimony is unrebutted that when Jack and Linda lived in Atlanta, Jack earned a salary of over $100,000. Clearly, Jack's earning history over time shows that he has the ability to earn much more than $24,000 per year. The evidence illustrates that every year as the litigation in Jack's divorce continues, he contends that he earns less and less, from $100,000 + prior to 1991, to $74,710 in 1997, to $62,274 in 2001, to $57,271 in 2002, and, finally, to the unbelievably low current income of $23,725.

Jack is the current Vice President and day-to-day manager of Parker Glass Company, which generates revenues of over $1.2 million per year. Jack testified that, with the current construction boom in Florida, these revenues are increasing. Parker Glass Company can, should, and already may be paying Jack an appropriate wage. Yet, Jack only admits receiving a wage many day laborers would reject.

Jack testified that he does not make any decision about the amount of his salary or bonuses. Rather, Jack contends his father, who again is a 50 percent owner of the company after Jack voluntarily relinquished his shares, and another partner make all decisions regarding Jack's salary and bonuses. Based upon the Court's ob-

---

8. Jack's pay stub for last year, through December 2, 2004, shows that, year-to-date, Jack received income of $29,400, including bonuses of $5,780.94. (Debtor's Ex. No. 12.)

9. Jack consistently has made all required child support payments. As of November 4, 2004, the Florida state court confirmed that he was current on these domestic support obligations. (Debtor's Ex. No. 6.) Jack's child support obligations stop in May 2006.

10. In his answers to Linda's interrogatories, question number 4, Jack indicates that his net income is only $233.24 per week, which would equal a monthly net income of $1,010.70. (Linda's Ex. No. 4.) This answer is entirely consistent with Jack's schedules filed with the Court. However, Jack's pay stub for the period ending December 2, 2004, reflects a higher monthly net income of $1,393.34 (Debtor's Ex. No. 12), a difference of almost $400 per month.

11. Jack's Schedule I, reflecting income of $1,000 per month attributable to side jobs or bonuses, is not consistent with his answer to Question # 2, on his Statement of Financial Affairs that stated he received no "income other than from employment or operation of business."

servation of Jack's demeanor and assessing the content of his testimony, the Court does not find Jack's explanation for his incredibly low salary credible.

■ The Court finds Jack's testimony regarding his income incredible. Specifically, the Court finds that Jack has the authority to increase his salary, but he chooses instead to plead poverty during this litigation. Jack can pay himself a much higher salary than $24,000 per year, but does not. It is not credible that Jack would continue to work for a business that pays such an obviously low income, when his demonstrated earning capacity is much higher. Jack simply does not want to provide documented income that will be used to pay Linda. As such, the Court finds it appropriate to impute income [12] to Jack of at least $75,000 per year and even this assumption may be a gross understatement.

With this more realistic income assumption, Jack could pay a large percentage of his outstanding unsecured debts over three years. With a gross salary of $75,000 and deducting Jack's child support obligation [13] of $7,523.50, federal taxes at 25 percent annually of $18,750, insurance cost of $36.40 per month for a total annual cost of $436.80, and recurring expenses, including his mortgage payment of $25,915.92 per year, Jack could pay unsecured creditors $22,374.68 for the first year, and an additional $9,028.20 in each of the two remaining years of his Chapter 13 plan. Therefore, over the life of a three year plan, Jack's unsecured creditors would receive $85,180.44 or approximately 65 percent of their outstanding claims.

Jack does not offer to pay his creditors anywhere close to this amount. In his initial Chapter 13 Plan (the "Initial Plan") (Doc. No. 47), Jack would continue to pay Chase Mortgage outside of the plan, in the normal course. He proposed to pay $1,189.69 per month to his unsecured creditors for 36 months, which would yield an approximate recovery of 32 percent. In addition, Jack agreed to pay the Chapter 13 trustee any tax refunds or bonuses he received over $5,000.

However, the Initial Plan contains a huge caveat. Because Jack acknowledges no disposable income, he can make these payments only if Linda agrees to abate Jack's child support payments. Essentially, Linda must choose whether she wants to receive child support payments for their daughter or get paid on her claim along with the claims of the other unsecured creditors. This absurd provision is contained in paragraph 10, which reads:

> Payment under this Plan is strictly contingent upon the ex-spouse Linda Vick's express agreement to abate child support during the pendency of the Chapter 13 and for such payments to resume upon the completion of the plan (payment #36) for the same number of months as they are abated.

On its face, Jack's plan fails because he assumes that Linda will agree to delay child support for 36 months in exchange

**12.** Bankruptcy Courts are "under a duty to scrutinize, and in appropriate circumstances adjust, a debtor's income and expenses so as to ensure that such income and expenses reflect a true picture of the debtor's financial situation." *In re Flores*, 282 B.R. 847, 854 (Bankr.N.D.Ohio.2002). Courts can impute income to a debtor in connection with the "disposable income" test of Section 1325(b)(2). *In re Traut* 282 B.R. 863, 869 (Bankr.N.D.Ohio.2002) (*citing Hart v. Molino* (*In re Molino*), 225 B.R. 904, 908 (6th Cir. BAP 1998); *Burton v. Burton* (*In re Burton*), 242 B.R. 674, 682 (Bankr.W.D.Mo.1999)).

**13.** The Court will assume that, since Jack's child support obligations stop in May 2006, Jack has 10 remaining child support payments of $752.35, for a total of $7,523.50.

for receiving roughly the same payment towards the Divorce Award.

Jack's First Amended Chapter 13 Plan (the "Amended Plan") (Doc. No. 78) is no improvement over his Initial Plan. The primary difference is that Jack now included his monthly mortgage payment of $965 due to Chase Manhattan Mortgage Company in the plan. Payments to unsecured creditors reduced slightly to $1,181 per month. In addition, paragraph 10 is changed slightly to give Linda a new alternative to consider:

> Payment under this Plan is strictly contingent upon the ex-spouse Linda Vick's express agreement (or Court Order) to abate child support during the pendency of the Chapter 13 and for such payments to resume upon the completion of the plan (payment # 36) for the same number of months as they are abated. In the alternative, payments would increase in around [sic] May 2006 (payment # 25) when Debtor's child support obligation terminates.

Linda, quite understandably, does *not* agree to abate Jack's payment of child support. Therefore, payments to unsecured creditors would not effectively begin until May, 2006. Over the last year of the Amended Plan, from May, 2006 to May, 2007, unsecured creditors would receive payments of $14,172 for a recovery of approximately 10 percent which is *de minimus* at best.[14] This case started as a way for Jack to avoid paying Linda and, unfortunately, has remained merely a vehicle for Jack to avoid paying his legitimate debts rather than utilizing the favorable provisions of Chapter 13 to repay legitimate debts over time.

Section 1325(a)(3) of the Bankruptcy Code provides that a Court shall confirm a plan if, among other reasons, "the plan has been proposed in good faith." If a creditor objects to confirmation based on a lack of good faith, the burden then shifts to the debtor to show good faith. *In re Caldwell,* 895 F.2d 1123, 1126 (6th Cir. 1990) ("The party who seeks a discharge under Chapter 13 bears the burden of proving good faith.") (*citing In re Girdaukas,* 92 B.R. 373, 376 (Bankr.E.D.Wis. 1988)).

Good faith, however, is not a defined term. Rather, the totality of circumstances surrounding the debtor's actions in his Chapter 13 case is relevant in establishing good faith. Some factors to use in determining good faith include an analysis of the debtor's income and expenses, the duration of the Chapter 13 plan, the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13, the debtor's degree of effort, the debtor's ability to earn and the likelihood of fluctuation in his earnings, the circumstances under which the debtor has contracted his debts, and his past dealings with his creditors. *In re Kitchens,* 702 F.2d 885, 888–889 (11th Cir.1983). The guiding principle is whether the debtor proposed his Chapter 13 plan with a sincere intent to repay, to the best of his ability, the claims of his creditors or, instead, whether the Chapter 13 filing was an attempt to defer or avoid the claims of legitimate creditors. The basic inquiry is whether, under the circumstances, the debtor has abused the provisions, purpose, or spirit of the Bankruptcy Code. *Id.*

Chapter 13 gives debtors a wonderful opportunity to repay their debts in "a more orderly and effective way" without

---

14. "A Chapter 13 plan which proposes to repay only a small portion of a debt which could not be discharged under Chapter 7 deserves 'particular scrutiny.'" *Caldwell,* 895 F.2d at 1126 (*citing In re Warren,* 89 B.R. 87, 95 (9th Cir. BAP 1988)).

constant fear of collection calls at home and at work. *In re Britt*, 211 B.R. 74, 76 (Bankr.M.D.Fla.1997).

> Congress intended to encourage, but not require a financially overextended debtor to make greater voluntary use of repayment plans commensurate with the debtor's abilities. The greater use of repayment plans results in effective means for improving debtor relief and creditor recoveries. *Id.*

However, the good faith requirement prevents undeserving debtors from benefiting from the Chapter 13 super-discharge.[15] Debtors who have otherwise nondischargeable claims can get relief in a Chapter 13 case, as long as they make their best possible effort to repay their creditors over three years.

■ The substantiality of the repayment to the unsecured creditors, however, is certainly an important factor to consider in determining good faith. *Kitchens*, 702 F.2d at 889. As indicated in the legislative history of Section 1325(a)(3), "[t]he court [could] confirm a chapter 13 plan which proposes no dividend whatever to holders of allowed unsecured claims or that the court deny confirmation of a plan proposing a 95% dividend to holders of such claims." The key to good faith is whether the debtor is exercising his best efforts or, instead, is merely abusing the system to delay or avoid payment of legitimate claims.

■ Here, based on the factual findings above, the Court concludes that Jack did not convert this case or file his Chapter 13 plan in good faith. He improperly used his $6,800 tax refund without Court

approval when every dollar should have gone to pay his debts. He is woefully understating his income and earning capacity. Every year Jack allegedly makes less and less as his litigation with Linda continues. He has the ability to earn substantially more and repay unsecured creditors a hefty 65 percent of their claims as opposed to a paltry 10 percent, with delayed payments not starting until June 2006. Jack has demonstrated a lengthy history of refusing to pay Linda, and any further deferral will only facilitate Jack's efforts to avoid paying his debts insofar as this Court is not convinced he will continue making his Chapter 13 payments when his child support obligations stop. Under no scenario has Jack proposed his Chapter 13 plan with a sincere intent to repay his debts. He wants to pay little or nothing in exchange for a discharge when he has the ability to pay a substantial portion of his debts. As such, the Court finds that Jack's Chapter 13 plan was filed in bad faith and is not confirmable. Further, the Court finds there is no reason to allow this case to continue and will dismiss this Chapter 13 proceeding. Jack is essentially current on his non-divorce related debts. The entire purpose of the bankruptcy filing was to address the divorce-related debts, which in all probability, are not dischargeable in a Chapter 7 case. Given that Jack's attempt at Chapter 13 reorganization has now failed, no purpose is served by continuing the bankruptcy case. Given Jack's bad faith and his dilatory litigation tactics to forestall payment, dismissal of this case is appropriate to avoid further delay and prejudice to Jack's creditors.

---

**15.** Currently, the Section 1328(a) of the Bankruptcy Code grants Chapter 13 debtors a discharge of many debts that, in a Chapter 7 case, would not be dischargeable. For example, debts arising from actual fraud are not dischargeable in a Chapter 7 case, but, today, are dischargeable in a Chapter 13 case. It is probable that Jack's debt to Linda is not dischargeable in a Chapter 7, pursuant to Section 523(a)(15) of the Bankruptcy Code, but that the debt would be dischargeable under Chapter 13's super-discharge.

The Court, therefore, denies confirmation and dismisses this case with regret because dismissal will only result in renewed litigation between these adversarial parties. The Court especially sends condolences to the state court judges who will have to listen to these parties' continuing squabbles for some time to come. The sad fact is that Jack had a chance to do what was right and pay his debts. He could have extended his payments over an extended five-year period and, if he had used his best efforts, he could have paid less than 100 percent. Instead, he chose to play more games.

Accordingly, the Court holds that Jack's Chapter 13 Plan was filed in bad faith. Confirmation is denied. Further, dismissal of this case is appropriate due to the delay cause by Jack's dilatory tactics, first in his Chapter 7 case, and then after his conversion to Chapter 13. The case is dismissed. A separate order consistent with this memorandum opinion shall be entered.